OPINION

 

No. 04-10-00385-CV

 

GUARDIANSHIP OF
C.E.M.-K., A Minor,

 

From the Probate
Court No. 1, Bexar County, Texas

Trial Court No. 2009-PC-1911

Honorable Polly
Jackson Spencer, Judge Presiding

 

Opinion by:   Marialyn Barnard, Justice

 

Sitting:                     Rebecca Simmons, Justice

                     Steven
C. Hilbig, Justice, concurring in the judgment only

                     Marialyn
Barnard, Justice

 

Delivered and
Filed:  February 16, 2011

 

AFFIRMED

 

This is an appeal from a
judgment in a suit affecting the parent-child relationship.  After the death of
C.E.M.-K.’s mother, M.M., a dispute regarding custody arose between the child’s
former stepfather and her biological father.  Following a bench trial, the
trial court appointed the child’s former stepfather, appellee B.H.M., sole
managing conservatorship of the minor child, and the child’s biological father,
J.P.K., possessory conservator.  J.P.K. appeals, contending: (1) B.H.M. had no
standing, and therefore the trial court’s judgment is void; and (2) the trial
court abused its discretion in appointing B.H.M., rather than J.P.K., as the
child’s managing conservator.  We affirm the trial court’s judgment.  

Background

           The extensive facts begin when
J.P.K. and M.M. were married in 1995.  On January 27, 1999, M.M. gave birth to
a female child, C.E.M.-K., who was conceived through artificial insemination.  After
the child’s birth, the couple ceased cohabiting, and M.M. filed for divorce in
October 2000.  The couple was divorced by a final decree signed by a Hays
County, Texas trial court on July 12, 2002.  Pursuant to the divorce decree, M.M.
was named sole managing conservator of C.E.M.-K.  J.P.K. was named possessory
conservator, and the parties agreed he was to have possession “at all times
agreed to by the parties.”  The parties also agreed J.P.K. would be given
reasonable telephone access to C.E.M.-K., and that he would notify M.M. “a
reasonable period in advance of when he is requesting possession of the minor
child.”  It seems this arrangement worked for a time, and J.P.K., who is an
artist, kept C.E.M.-K. during the day when M.M. was at work.  However,
according to J.P.K., relations with M.M. became strained sometime in 2003 when
he learned M.M. was having an affair with the principal of the school where she
worked.  M.M. moved away from the family residence in Wimberley to San Antonio,
taking C.E.M.-K. with her.  J.P.K. claimed he learned there were child abuse
issues in the principal’s family, and he contacted an attorney.  This,
according to J.P.K., was when “World War III” began with M.M.–she felt
threatened.  It appears that from that point forward, M.M. simply denied J.P.K.
access to C.E.M.-K.  

Around this same time, J.P.K.
began to suffer debilitating medical problems stemming from injuries suffered
in 1969 during his military service in Vietnam.  In early 2004, he underwent a
kidney transplant, and ultimately had open-heart surgery to repair a heart
valve.  In the summer of 2004, and on the mend from his kidney transplant, J.P.K.
began writing letters to M.M. asking to “re-establish” his relationship with
C.E.M.-K., stating it had been a long time since he had seen the child.  In a
subsequent letter, J.P.K. states he had not seen the child since December
2003.  Six letters from J.P.K. to M.M. were admitted into evidence.  The
letters are from June 2004 to February 2005.  In each letter J.P.K. asked to
make arrangements to see C.E.M.-K, and asked to allow C.E.M.-K. to call him as
well.  In the last letter, J.P.K. referenced a phone message left for him by M.M.
in which she allegedly stated she refused to allow J.P.K. to see C.E.M.-K.
because neither he nor his mother are of any relation to C.E.M.-K.  In response,
he reminded her to read the divorce decree and the child’s birth certificate.  

J.P.K. admitted he stopped
paying court-ordered child support in 2004.  He stated that given M.M.’s
refusal to allow him to see C.E.M.-K., it was his only option because he could
not afford an attorney to go back to court to help him enforce his visitation
rights.  J.P.K. moved to Florida in late 2004.  It appears from the record that
after the February 2005 letter, there was no contact between J.P.K. and M.M. or
J.P.K. and C.E.M.-K.  J.P.K. testified, however, that he continued to seek help
with the visitation issue, writing law enforcement, courts, attorneys, and
others.  However, given his lack of finances–his only income was military
disability and money from a few art sales–no one would help him.  

M.M. met B.H.M. in October
2003 when M.M. hired B.H.M.’s company to put up a fence at her new home in San
Antonio.  They began dating in January 2004, and B.H.M. and two of his three
sons moved into M.M.’s home in November 2004.  M.M. became pregnant, and the
couple married in June 2005.  Their daughter was born September 20, 2005.  M.M.’s
house had three bedrooms–the couple stayed in one room, B.H.M.’s boys in
another, and C.E.M.-K. and the couple’s new child stayed in the third bedroom. 


Unfortunately, all was not
well in the home.  M.M. had a serious alcohol addiction, which eventually tore
the family apart.  B.H.M. testified that when he first met M.M., she drank
without a problem.  Later, she was unable to control her drinking.  B.H.M.
admitted that when M.M. drank she could be violent, and at times was unable to
take care of the children or even get out of bed.  In 2006, he came home one
evening and found M.M. drunk and angry.  After dinner, he heard his youngest
son screaming and found M.M. beating him.  He admitted grabbing M.M. by the
neck, dragging her out of the room, and slapping her.  He then left the house
with the boys, and a neighbor came over and took C.E.M.-K. and her half-sister
to her house.  M.M. called the police and filed a report.  B.H.M. testified he
was arrested a year later, but was placed on deferred adjudication, which he
successfully completed.  B.H.M. returned with his sons, and the couple resumed
their relationship.  

B.H.M. stated that M.M. was
eventually able to stop drinking on her own.  However, when her brother died,
she began drinking again, and her drinking was exacerbated by prescription drug
use.  B.H.M. admitted buying alcohol for M.M., but stated he either had to
provide it for her or she would drive under the influence and buy it herself,
which might result in her death or arrest or the injury or death of some other
motorist.  In the spring of 2008, B.H.M. stated M.M. was “in a bad way,” and
someone called Texas Department of Family and Protective Services (“the
Department”).  M.M. was required to seek treatment for her alcoholism.  While
she was in a rehabilitation facility, all four children stayed with B.H.M. 
After M.M. completed rehabilitation, the Department closed the case.  According
to B.H.M., M.M. stayed sober for approximately two months, but then began to
drink again.  In June 2008, B.H.M. and M.M. separated; B.H.M. took his sons and
left.  M.M. filed for divorce, which was finalized on September 15, 2008. 
Pursuant to the divorce decree, B.H.M. and M.M. were named joint managing
conservators of their child, but M.M. was given primary possession.  After the
divorce, C.E.M.-K. and her half-sister lived with M.M., but B.H.M. and his boys
lived close by.  B.H.M. testified that after the divorce, he saw C.E.M.-K. and
his daughter “constantly.”  He stated that he fed the children, made sure they
got to school, and did all he could to support M.M. in her sobriety.  B.H.M. said
that although they were divorced, the family remained cohesive, generally
staying together either at M.M.’s or at his home.  He testified it was
necessary for him to stay close by because of M.M.’s drinking cycles–if he was
not there, he would have feared for the girls’ safety.  

In December 2008, the
Department received a report of abuse and neglect in the M.M. household.  An
investigator for the Department, Jerusha Lee Jennings, went to the home to
investigate.  Jennings testified it was not safe to leave the girls with M.M.,
and she, along with M.M., agreed to a safety plan, which required the girls to
live with B.H.M.  M.M. did not mention J.P.K., telling Jennings C.E.M.-K. was
conceived through artificial insemination.  B.H.M. also failed to mention J.P.K.,
though he knew of him, claiming he was never asked about C.E.M.-K.’s father. 
Jennings stated she determined B.H.M.’s home was safe and C.E.M.-K. was
comfortable staying with B.H.M.  Accordingly, the girls moved into B.H.M.’s
home on December 9, 2008.  According to the evidence, the girls remained with B.H.M.
until the Department closed the case and returned the girls to M.M. in early
April 2009, after M.M. had completed the Department requirements.  Until the
girls returned to M.M.’s home, B.H.M. stated he was fully responsible for their
care and well-being.  

As a result of the
investigation, the Department found “reason to believe” both M.M. and B.H.M.
had engaged in negligent supervision and physical neglect of both C.E.M.-K. and
her half-sister.  “Reason to believe” is defined by the Department to mean “a
preponderance of the evidence supports that the alleged abuse or neglect did
occur.”  However, Jennings testified the findings as to B.H.M. were technical,
based on the fact that given the first abuse report in the spring of 2008, he
had been required to report to the Department if M.M. began to drink again. 
His failure to report M.M.’s drinking was cause for the “reason to believe”
findings.  Jennings asserted this finding was a technical requirement, and she
believed B.H.M. when he told her he did not call because he believed that if M.M.
found out he called, she would deny him access to the girls, putting them in
more danger.  

The girls went back to M.M.’s
home in early April 2009.  After the girls were returned to M.M., B.H.M. spent
two-to-three nights a week at M.M.’s house, and the girls and M.M. then came to
his house most of the other nights of the week.  B.H.M. testified he was
generally responsible for the girls’ care, feeding them and making sure they
were bathed and ready for school.  M.M. attended Alcoholics Anonymous meetings
in the evenings.  On May 5, 2009, approximately a month after the girls were
returned to M.M., B.H.M. went over to M.M.’s house, bringing her coffee.  He
then took his daughter to school.  After he took his daughter to school, he had
to take his boys to their great-grandmother’s funeral.  As he was walking into
the funeral services around 12:00 p.m., he received a call from M.M.  B.H.M.
said he reminded M.M. that he was at the funeral.  M.M. apologized and they
hung up.  This was the last time B.H.M. spoke with M.M.  After the funeral, he
tried to call M.M., but she did not answer.  As M.M.’s house was on the way, he
decided to drive by before going to Fort Sam Houston for the burial portion of
the funeral services.  

When B.H.M. saw M.M.’s
truck in the driveway, B.H.M. dropped the boys off at his house, and then went back
to M.M.’s house–this was around 2:00 p.m.  B.H.M. said he entered the house,
went back to M.M.’s bedroom, and found her sitting on her bed, folded over at
the waist.  He screamed at her, but got no response.  He testified she had a
plastic bag over her nose and mouth, and she was purple.  B.H.M. stated he
tried to clear her airway and resuscitate her but could not.  He called 911. 
After emergency services arrived, he called C.E.M.-K.’s school and asked them
to hold her there until his son could pick her up.  Later, the medical examiner
ruled M.M.’s death an accident, the result of “toluene toxicity.”[1]
 

           After M.M.’s death, C.E.M.-K.
remained with B.H.M.  On June 26, 2009, he filed an application to be appointed
C.E.M.-K.’s guardian.  The application identified J.P.K. as 
C.E.M.-K.’s biological father.  Several of M.M.’s relatives signed waivers and
consented to B.H.M.’s appointment as guardian.  In response, J.P.K. filed a
special appearance and plea to the jurisdiction, arguing exclusive jurisdiction
remained in the Hays County court, which signed the original divorce decree.  J.P.K.
also requested to be appointed C.E.M.-K.’s permanent guardian.  The probate
court appointed an attorney ad litem for C.E.M.-K.  

On or about September 9,
2009, J.P.K. filed a petition for writ of habeas corpus in a Bexar County
district court pursuant to section 157.372(a) of the Texas Family Code.  That
section provides that if the right to possession of a child is governed by a
court order, the court in a habeas corpus proceeding shall compel return of the
child to the relator if the court finds relator is entitled to possession
pursuant to that court order.  Tex. Fam.
Code Ann. § 157.372(a) (West 2008).  This section has been interpreted
to mean the writ must be granted and the child returned to the person with a
superior right of possession unless the relator has consented or acquiesced in
actual possession and control of the child for six months or more, or there is
a serious immediate question concerning the child’s welfare.  Green v.
Schuble, 654 S.W.2d 436, 438 (Tex. 1983); Tex.
Fam. Code Ann. §§ 157.373(a), 157.374.  B.H.M., of course, relied upon
the exceptions, arguing the court should not return C.E.M.-K. to J.P.K. based
upon the 2002 divorce decree, but should make temporary orders allowing B.H.M.
to keep C.E.M.-K. until all issues were resolved.  The probate court entered an
order transferring the writ proceeding filed in the Bexar County district court
to probate court.  After a hearing, the probate court denied J.P.K.’s petition
for writ of habeas corpus, entering temporary orders providing that C.E.M.-K.
remain with B.H.M., but allowing visitation by J.P.K. and his current wife at
their temporary residence in Wimberley, Texas.  

B.H.M. and the ad litem
subsequently filed original petitions seeking to have the custody of C.E.M.-K.
determined by the court; B.H.M. filed his in Hays County, and the ad litem
filed in Bexar County.  J.P.K. filed answers to these petitions, seeking
custody on his own behalf, and challenging B.H.M.’s standing.  As it had with
the writ proceeding, the probate court transferred the Hays County proceedings
to the probate court.  After all the transfer orders were complete, all
proceedings relating to custody of C.E.M.-K. were under the jurisdiction of the
probate court.  

In addition to the
pleadings filed by the various parties interested in conservatorship of
C.E.M.-K., M.M.’s estate filed a motion to enforce the 2002 child support
order, seeking continued payment of child support as well as a judgment for
arrearages for the child support J.P.K. admittedly failed to pay.  J.P.K.
essentially conceded the child support issues.  

For three days in December
of 2009, a bench trial was held in the probate court concerning conservatorship
of C.E.M.-K.  There was testimony from a court-appointed psychologist, Jack
Gordon Ferrell Jr., who had no criticisms of either B.H.M. or J.P.K., opining
C.E.M.-K. was developing a life-long attachment with J.P.K. and his current
wife, which is very positive for the child, and C.E.M.-K. views B.H.M. as her
father-figure.  He cautioned, however, that it would not be in C.E.M.-K.’s best
interest to immediately move to Florida, and that it would result in damage to
her emotional state “for a period of time.”  Ferrell was also concerned about
removing C.E.M.-K. from her half-sister because they are extremely close.  

There was also testimony
from J.P.K. and B.H.M., each testifying as to why C.E.M.-K. should stay with
them.  J.P.K. emphasized that he was C.E.M.-K.’s father as opposed to a former
stepfather.  He noted that the disruption in his relationship with C.E.M.-K.
was M.M.’s fault, and that he was unable to challenge her given her family’s
wealth and his lack of finances.  B.H.M., on the other hand, testified that
C.E.M.-K. considered him her father, and she was extremely close to his entire
family, especially C.E.M.-K.’s half-sister.  B.H.M. pointed out the ties 
C.E.M.-K. has to San Antonio, including her friends, school, and extended
family.  

On cross-examination of
each man, the other side attempted to show their weaknesses as potential
custodians.  J.P.K. pointed out the fact that B.H.M. provided alcohol to M.M.
despite knowing she was an addict, assaulted M.M., and was the subject of a
“reason to believe” finding of neglect as to C.E.M.-K. and his daughter by the
Department.  B.H.M. emphasized that by early 2005, J.P.K. had given up all
efforts with regard to a relationship with C.E.M.-K., never calling, sending
cards, or sending gifts.  Additionally, he noted J.P.K. had stopped paying
child support in mid-2004.  B.H.M. intimated it was only when J.P.K. learned
that C.E.M.-K. was to inherit a large fortune that he returned to seek a
relationship with his daughter.  J.P.K. likewise insinuated that B.H.M.’s
interest stemmed from C.E.M.-K.’s inheritance.  

After considering the
evidence and arguments of counsel, the probate court awarded sole managing
conservatorship to B.H.M., C.E.M.-K.’s former stepfather.  J.P.K. was named
possessory conservator, and awarded standard visitation under the Texas Family
Code.  J.P.K. and his wife moved from Florida to Houston to more easily
accommodate the visitation schedule.  The estate was granted a judgment as to
child support arrearages, which J.P.K. does not contest.  

J.P.K. has appealed the
trial court’s judgment with regard to conservatorship, essentially arguing: (1)
the trial court erred in awarding conservatorship of C.E.M.-K. to B.H.M.
because B.H.M. failed to establish standing under the Texas Family Code,
rendering the judgment void; and (2) the trial court erred in awarding primary
possession to B.H.M., a non-parent, and failing to award primary possession to J.P.K.,
C.E.M.-K.’s biological father.  

Analysis

Standing

           J.P.K. first contends the trial
court erred in awarding conservatorship of C.E.M.-K. to B.H.M., a former stepfather,
because B.H.M. lacked standing.  B.H.M. responds that he established standing
pursuant to section 102.003(a)(9) of the Texas Family Code, having had
possession of C.E.M.-K. for more than six months ending within 90 days of suit
being filed.  

           The question of who has
standing to bring a suit affecting the parent-child relationship is a threshold
issue.  In re Y.B., 300 S.W.3d 1, 4 (Tex. App.—San Antonio 2009, pet.
denied) (citing In re S.S.J.-J., 153 S.W.3d 132, 134 (Tex. App.—San
Antonio 2004, no pet.)).  Standing is not merely a statutory bar, but is a
component of subject-matter jurisdiction.  In re H.G., 267 S.W.3d 120,
124 (Tex. App.—San Antonio 2008, pet. denied) (citing Tex. Ass’n of Bus. v.
Tex. Air control Bd., 852 S.W.2d 440, 444-45 (Tex. 1993)).  A court cannot
act if it does not have subject-matter jurisdiction, and if it does, any action
taken is void.  H.G., 267 S.W.3d at 124 (citing Mapco, Inc. v.
Forrest, 795 S.W.2d 700, 703 (Tex. 1990)).  If a party lacks standing, the
trial court is deprived of subject-matter jurisdiction.  H.G., 267
S.W.3d at 124.  

           “The Texas Legislature has
provided a comprehensive statutory framework for standing in the context of
suits involving the parent-child relationship.”  Id.  (citing Tex. Fam. Code Ann. §§ 102.003,
102.004, 102.0045, 102.005, and 102.006 (West 2008)).  When there is a
statutory framework for standing, a standing analysis is conducted within that
framework.  H.G., 267 S.W.3d at 123.  

           The party seeking relief must
allege and establish standing within the parameters of the statutory language. 
Id.  In the family law context, when the petitioner is statutorily
required to establish standing with “satisfactory proof, the applicable
evidentiary standard is a preponderance of the evidence.  In re A.M.S.,
277 S.W.3d 92, 96 (Tex. App.—Texarkana 2009, no pet.); Von Behren v. Von
Behren, 800 S.W.2d 919, 921 (Tex. App.—San Antonio 1990, writ denied). 
Whether the party has established standing is a question of law, which we
review de novo.  Tex. Dep’t of Transp. v. City of Sunset Valley, 146
S.W.3d 637, 646 (Tex. 2004); S.S.J.-J., 153 S.W.3d at 134.  When, as
here, the trial court does not make separate findings of fact and conclusions
of law, we imply the findings necessary to support the judgment.  Worford v.
Stamper, 801 S.W.2d 108, 109 (Tex. 1990).  We review the entire record to
determine whether the implied findings are supported by any evidence.  Waco
Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 853 (Tex. 2000).  

           B.H.M. alleged, and contends he
proved, standing pursuant to section 102.003(a)(9) of the Texas Family Code. 
That section provides that, “a person, other than a foster parent, who has had
actual care, control, and possession of the child for at least six months,
ending not more than 90 days preceding the date of the filing of the petition
has standing.”  Tex. Fam. Code Ann.
§ 102.003(a)(9).  The purpose of this section is to “create standing for those
who have developed and maintained a relationship with a child over time.”  Y.B.,
300 S.W.3d at 4.  A determination of standing under section 102.003(a)(9) is
fact specific, and must be resolved on a case-by-case basis.  Id.  It
should be noted that in computing the six month period under section
102.003(a)(9), the time need not be “continuous and uninterrupted.”  Tex. Fam. Code Ann. § 102.003(b). 
Rather, the court shall consider the child’s principal place of residence
during the relevant time period.  Id.  

           J.P.K. seems to contend B.H.M.
lacked standing because the evidence showed B.H.M. had “care, control, and
possession” of C.E.M.-K. for only three months, from December of 2008, when the
Department removed the child from M.M. and placed her with B.H.M., to March of
2009, when he claims the Department returned the child to M.M..[2]  J.P.K. wholly discounts
the time period from M.M.’s death, May 5, 2009, to September of 2009, when J.P.K.
filed his writ of habeas corpus under the Family Code, or November 2009, when
the first “original” petition in a suit affecting the parent-child relationship
was filed by B.H.M..  J.P.K. suggests the time period following M.M.’s death
should not be included in the six-month computation because upon M.M.’s death, J.P.K.
was entitled to custody of C.E.M.-K.  Whether he was entitled to possession at
that time or not, we hold it was B.H.M. who had “care, control, and possession”
after M.M.’s death.  J.P.K. has not cited any authority establishing the period
of time following M.M.’s death should be ignored simply because B.H.M. might
not have been entitled to possession–the fact was, B.H.M. had possession of
C.E.M.-K. following M.M.’s death.  

           Our review of the evidence,
despite J.P.K.’s claims, shows B.H.M. had “care, control, and possession” of
C.E.M.-K. from December 9, 2008 to the first week of April 2009.  This was the
time period in which the Department removed C.E.M.-K. and her half-sister from M.M.
and placed them with B.H.M. pursuant to a safety plan.  This gave B.H.M. “care,
control, and possession” of C.E.M.-K. for approximately four months.  Then, it
is undisputed that after M.M.’s death on May 5, 2009, and until J.P.K. filed
the writ of habeas corpus and obtained visitation in September 2009, B.H.M. had
sole and exclusive “care, control, and possession” of C.E.M.-K.  This second
period adds another four months to the previous time period, for a total of at
least eight months–and perhaps ten months if we count from the time of M.M.’s
death to the date B.H.M. filed the first original petition in this case.  Accordingly,
we hold B.H.M. established standing by a preponderance of the evidence under
section 102.003(a)(9).  

Conservatorship

           With regard to whether the
trial court erred in appointing B.H.M., rather than J.P.K., as sole managing
conservator, we first must determine whether this action involving C.E.M.-K.
was an original suit, which is governed by Chapter 153 of the Texas Family Code
and contains a presumption in favor of biological parents, or a modification under
Chapter 156 of the Texas Family Code, which contains no such presumption.[3]  The parental
presumption in Chapter 153 of the Texas Family Code applies only to original
suits, and states that unless the court finds appointment of a parent or
parents would not be in the best interest of the child because it would
significantly impair the child’s physical health or emotional development, the
trial court shall appoint a parent as sole managing conservator.  See Tex. Fam. Code Ann. § 153.131;  In
re V.L.K., 24 S.W.3d 338, 342-43 (Tex. 2000); In re C.A.M.M., 243
S.W.3d 211, 215-16 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).  J.P.K,
seeking the benefit of the presumption, argues this is an original action. 
Conversely, B.H.M. contends this is a modification, and therefore J.P.K. is not
entitled to the parental presumption.  

           Despite J.P.K.’s contentions, we
hold this is necessarily a modification given the 2002 divorce decree, the
death of M.M., and B.H.M.’s pleadings.  Our conclusion is based on the supreme
court’s opinion in V.L.K., its subsequent interpretation, and the
language in the Texas Family Code.  See In re V.L.K., 24 S.W.3d at
342-43; In re P.D.M., 117 S.W.3d 453, 457-58 (Tex. App.—Fort Worth 2003,
pet. denied); Tex. Fam. Code Ann.
§ 156.002.  

In V.L.K., the court
began by noting that “[a]fter a court makes an original custody determination,
a party may move to modify that determination.”  Id. at 342 (citing Tex. Fam. Code Ann. § 156.002).  Here,
“an original custody determination” as to conservatorship of C.E.M.-K. was made
by the Hays County court in the 2002 divorce decree.  Thus, the subsequent
actions filed by B.H.M., the ad litem, and J.P.K. were, per force,
modification actions.  See id.  However J.P.K. contends this cannot be a
modification because B.H.M. had no conservatorship or possessory rights prior
to the probate court’s temporary orders after the hearing on the writ of habeas
corpus.  In other words, because B.H.M. was not a party to the original suit
affecting the parent-child relationship, his suit must be considered an
original suit.  Thus, J.P.K. suggests, much as the petitioners did in V.L.K.,
that application of the parental presumption, i.e., whether the suit is
original or a modification, depends upon the identity of the parties.  In V.L.K.,
the supreme court rejected this argument, holding that a determination on the
applicability of the parental presumption, i.e., whether a suit is original or
a modification, does not depend upon the parties’ identities, but the
circumstances and the relief is sought.  See V.L.K., 24 S.W.3d at 342-43
(recognizing that Legislature did not impose different burdens on parents versus
nonparents, but imposed different burdens when suit is original versus
modification).  Thus, when there is any subsequent custody proceeding after an
original determination of conservatorship, as here, the proceeding is a
modification and the parental presumption does not apply, regardless of the
parties involved.  In re P.D.M., 117 S.W.3d at 457-58 (citing V.L.K.,
24 S.W.3d at 342-43).  

           Although B.H.M. styled his
pleadings as an original petition, and we have determined he has standing to
file an original petition pursuant to section 102.003(a)(9), which governs
standing in original suits, this does not determine the nature of the suit.  See,
e.g., In re C.A.M.M., 243 S.W.3d at 217 (describing action to modify
custody order after managing conservator’s death as suit to modify); P.D.M.,
117 S.W.3d at 456 (holding provisions of Chapter 156 of Texas Family Code
governing modifications clearly apply to suits that attempt to effect change in
custody after entry of initial custody order); see also State Bar of Tex. v.
Heard, 603 S.W.2d 829, 833 (Tex. 1980) (holding that courts look to
substance of plea for relief to determine nature of pleading, not merely title
of pleading).  First, it is undisputed there was a prior custody determination
under the 2002 divorce decree.  Second, given B.H.M.’s standing under section
102.003(a)(9), he also had standing to file a modification.  See Tex. Fam. Code Ann. § 156.002(b)
(stating that person or entity who, at the time of filing, has standing to sue
under Chapter 102 may file suit for modification in court with continuing,
exclusive jurisdiction).  

As to his pleadings, B.H.M.
filed for termination of J.P.K.’s parental rights and conservatorship of
C.E.M.-K. in the Hays County trial court, the court of continuing, exclusive
jurisdiction, asking “to modify the prior orders” and award him “sole custody”
on the basis of M.M.’s death.  Thus, B.H.M. was clearly seeking a
modification.  Moreover, it appears J.P.K. himself considered the proceedings
to determine conservatorship of C.E.M.-K. a modification action.  In his writ
of habeas corpus, by which he sought to obtain immediate custody of C.E.M.-K., J.P.K.
specifically moved the court “to modify the prior orders of the Court
contained in Cause No. 2000-1247,” which was the 2002 divorce decree rendered
by the Hays County court.  (emphasis added).  Accordingly, we hold the relief
sought by B.H.M. and J.P.K. in this case is controlled by Chapter 156 of the
Family Code governing modifications.  

           When J.P.K.’s remaining issues
are considered, he essentially contends the trial court erred in appointing B.H.M.
as managing conservator because (1) the evidence was insufficient to support
the decision, and (2) B.H.M. was precluded from an appointment as managing
conservator because of his history of family violence and his neglect of
C.E.M.-K. and her half-sister.  We shall address each contention in turn.  

Sufficiency

           As this is a modification
action under Chapter 156, it is well-established that the parental presumption
relied upon so heavily by J.P.K. does not apply.  See, e.g., V.L.K., 24
S.W.3d at 342-43; C.A.M.M., 243 S.W.3d at 215-16; P.D.M., 117
S.W.3d at 457-58; In re A.D.H., 979 S.W.2d 445, 447 (Tex. App.—Beaumont
1998, no pet.).  Rather, that presumption applies only to original suits.  See
id; see also Tex. Fam. Code
Ann. § 153.131.  Accordingly, we must review the trial court’s conservatorship
decision under Chapter 156, which provides that modification of a prior court
order regarding conservatorship is appropriate if the modification would be in
the best interest of the child, and “the circumstances of the child,
conservator, or other party affected by the order have materially and
substantially changed since . . . the date of the rendition of the order.”  Tex. Fam. Code Ann. § 156.101 (West
Supp. 2010).  

           Generally, orders arising from
a suit affecting the parent-child relationship will not be overturned on appeal
unless the complaining party demonstrates a clear abuse of discretion by the
trial court.  C.A.M.M., 243 S.W.3d at 214 (citing Worford v. Stamper,
801 S.W.2d 108, 109 (Tex. 1990)).  More specifically, we review a decision to
modify conservatorship for a clear abuse of discretion.  In re R.H.H.,
No. 04-09-00325-CV, 2010 WL 2842905, at *3 (Tex. App.—San Antonio Jul 21, 2010,
no pet.) (mem. op.) (citing Worford, 801 S.W.2d at 109; In re Guthrie,
45 S.W.3d 719, 727 (Tex. App.—Dallas 2001, pet. denied)).  An abuse of
discretion occurs when a trial court acts arbitrarily, unreasonably, or without
regard to guiding principles of law.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241 (Tex. 1985).  A trial court does not abuse its discretion
if there is some evidence of substantive and probative character to support its
decision.  Vardilos v. Vardilos, 219 S.W.3d 920, 921 (Tex. App.—Dallas
2007, no pet.).  Moreover, a trial court is in the best position to observe the
witnesses and their demeanor, and therefore is given great latitude in
determining a child’s best interests.  R.H.H., 2010 WL 2842905, at *3 (citing
Garner v. Garner, 200 S.W.3d 303, 306 (Tex. App.—Dallas 2005, pet.
denied)).  

When the proper standard of review is abuse of
discretion, challenges to the legal and factual sufficiency of the evidence are
not independent grounds of error; rather, they are simply factors in
determining whether the trial court abused its discretion.  Gardner v.
Gardner, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.); London
v. London, 192 S.W.3d 6, 14 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).  Therefore, an appellate court must engage in a two-prong analysis and
determine “(1) whether the trial court had sufficient information upon which to
exercise its discretion; and (2) whether the trial court erred in its
application of discretion.”  Gardner, 229 S.W.3d at 751; Sotelo v.
Gonzales, 170 S.W.3d 783, 787 (Tex. App.—El Paso 2005, no pet.).  Once we
determine whether sufficient evidence exists, we must then decide whether the
trial court’s decision was reasonable.  Sotelo, 170 S.W.3d at 787.  

           In undertaking this analysis,
the appellate court uses the traditional standards of review for legal and
factual sufficiency.  Gardner, 229 S.W.3d at 751.  In considering the
legal sufficiency of the evidence, we consider the evidence in the light most
favorable to the verdict, crediting favorable evidence if a reasonable
factfinder could, and disregarding contrary evidence unless a reasonable
factfinder could not.  City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005); City of San Antonio v. Kopplow Dev., Inc., No.
04-09-00403-CV, 2010 WL 4336172, at *3 (Tex. App.—San Antonio Nov. 3, 2010, no
pet.).  We also indulge every reasonable inference that would support the
factfinder’s finding.  City of Keller, 168 S.W.3d at 822.  The ultimate
test for legal sufficiency is whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.  Id.
at 827.  

In a factual sufficiency
review, we consider all the evidence supporting and contradicting the
trier-of-fact’s finding.  Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d
442, 445 (Tex. 1989); Kopplow Dev., Inc., 2010 WL 4336172, at *3.  We
set aside the factfinder’s finding only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986) ); Kopplow Dev., Inc., 2010
WL 4336172, at *3.  The reviewing court cannot substitute its conclusions for
those of the factfinder.  If there is sufficient competent evidence of
probative force to support the factfinder’s decision, it must be upheld.  Carrasco
v. Goatcher, 623 S.W.2d 769 (Tex. App.—El Paso 1981, no writ).  It is not
within the province of this court to interfere with the factfinder’s resolution
of conflicts in the evidence or to pass on the weight or credibility of the
witness’s testimony.  Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792
(1951).  Where there is conflicting evidence, the factfinder’s decision on such
matters is generally regarded as conclusive.  Clark v. National Life &
Accident Ins. Co., 145 Tex. 575, 200 S.W.2d 820, 821 (1947).  

Suits such as the one before us are “intensely fact
driven,” and therefore the supreme court has developed numerous factors
relevant to a best interests consideration: (1) the child’s desires, (2) her
emotional and physical needs now and in the future, (3) any emotional and
physical danger to the child now and in the future, (4) the parental abilities
of the individuals seeking primary possession, (5) the programs available to
assist these individuals to promote the child's best interest, (6) the plans
for the child by those seeking primary possession, (7) the stability of the
home or proposed placement, (8) the acts or omissions of the parent which may
indicate that the existing parent-child relationship is not a proper one, and
(9) any excuse for the acts or omissions of the parent.  Holley v. Adams,
544 S.W.2d 367, 371-72 (Tex. 1976).  In the specific context of modification of
conservatorship, courts also consider the child’s need for stability, and the
need to prevent constant litigation regarding conservatorship of the child.  V.L.K.,
24 S.W.3d at 343; C.A.M.M., 243 S.W.3d at 221.  

Given the absence of the
parental presumption, the applicable standards of review, the Holley and
V.L.K. factors, and the evidence as set forth in the background portion
of this opinion, we hold the probate court had sufficient evidence upon which
to base its decision, and the probate court did not abuse its discretion in
awarding sole managing conservatorship of C.E.M.-K. to B.H.M. as opposed to J.P.K.. 
The evidence was undisputed that C.E.M.-K.’s circumstances, as well as that of
her former conservator “materially and substantially changed” since the date of
the 2002 order determining conservatorship.  See Tex. Fam. Code Ann. 
§ 156.101  This is obvious–the original conservator, C.E.M.-K.’s mother, died. 
Moreover, there was evidence modification would be in C.E.M.-K.’s best
interest, and that her interests would best be served by remaining with B.H.M.,
the only father-figure she has really ever known, and within the community
where she has stability and support through school, friends, and extended
family.  See id.  

Family Violence/Findings of Neglect

           J.P.K. next contends the
probate court erred in appointing B.H.M. as managing conservator because his
appointment was precluded by section 153.004(b) of the Texas Family Code.  That
section states, in pertinent part:

The court may not appoint joint managing conservators
if credible evidence is presented of a history or pattern of past or present
child neglect, or physical . . . abuse by one parent directed against the other
parent . . . 

 

Tex. Fam. Code
Ann. § 153.004(b).  In support of his
argument, J.P.K. first points to the “reason to believe” findings by the
Department.  After the Department’s first visit to the B.H.M.-M.M. home, B.H.M.
was required to report to the Department if he became aware that M.M. was
drinking again; admittedly, he did not.  Therefore, when the Department visited
M.M.’s home in December 2008 and found M.M. drinking again, the Department was
technically required, according to the testimony of the Department
investigator, Jerusha Jennings, to issue a “reason to believe” finding that B.H.M.
had negligently supervised and physically neglected C.E.M.-K. and her
half-sister.  B.H.M. explained, however, that although he was aware he was
required to report M.M. to the Department, he did not do so out of fear that M.M.
would discover any report, and cut him off from the girls.  Even though M.M.
was drinking, B.H.M. was able to watch over them and protect them.  B.H.M.
testified that if M.M. became angry and denied him access to the girls, they
would be in greater danger.  In essence, he testified he was faced with a
Hobson’s 

Choice.[4]  B.H.M.’s
testimony regarding his dilemma was supported by Jennings’s testimony. 
Jennings testified the “reason to believe” findings as to B.H.M. were
technical, a Department requirement given the first abuse report in the spring
of 2008.  Jennings asserted that although she was technically required to make
the findings, she believed B.H.M. when he told her he did not call because he
believed that if M.M. found out he called, M.M. would deny him access to the
girls, placing them in greater danger.  Given the testimony, we hold the
probate court, in its discretion, could have concluded there was no “history or
pattern of past or present child neglect” under section 153.004(b).  Moreover,
in a modification proceeding, the best interest of the child is always the
trial court’s primary concern, and B.H.M.’s explanation, supported by Jennings’s
testimony, was sufficient for the probate court to conclude that despite the
“reason to believe” findings in 2008, it was still in C.E.M.-K.’s best interest
to be placed with B.H.M..  

           J.P.K. also points to the fact
that B.H.M. was placed on deferred adjudication for his alleged assault of M.M.. 
J.P.K. contends this precluded B.H.M.’s appointment as managing conservator
pursuant to section 153.004(b).  We disagree.  B.H.M. testified that in the
2006, he came home one evening and found M.M. drunk and angry.  He stated that
after dinner, he heard his youngest son screaming and found M.M. beating his
son.  B.H.M. admitted grabbing M.M. by the neck, dragging her out of the room,
and slapping her.  M.M. called the police and filed a report.  B.H.M. testified
the girls were not present when this occurred, but were asleep in their room.  B.H.M.
admitted he was arrested a year later based on the confrontation with M.M., but
was placed on deferred adjudication, which he successfully completed.  The
terms of his deferred adjudication required he attend an anger management
class, from which B.H.M. stated he learned to deal with such situations.  

Although a single act of
violence can constitute a “history” of physical abuse for purposes of section
153.004(b), we hold B.H.M.’s actions in this case are not the sort that would
preclude his appointment as managing conservator.  In the case of In re
R.T.H., the El Paso Court of Appeals was presented with a similar claim as
that asserted by J.P.K..  See 175 S.W.3d 519 (Tex. App.—El Paso 2005, no
pet.).  In R.T.H., a father sought a modification of conservatorship,
seeking to be named the joint managing conservator with the sole right to
determine his child’s primary residence.  Id. at 520.  The trial court
denied the requested modification, and the father appealed claiming the trial
court erred in denying his petition because he presented “‘credible evidence .
. . of a history or pattern of past or present . . . physical . . . abuse.’”  Id.
(quoting Tex. Fam. Code Ann. §
153.004(b)).  The father claimed the child’s mother, who had the current
exclusive right to determine the child’s primary residence, assaulted him.   R.T.H.,
175 S.W.3d at 520.  The father pointed to testimony from the modification
hearing that the mother came to his apartment and assaulted him by “punching
[him] and grabbing [him] by the neck and scratching [him].”  Id.  The
father explained the mother was attempting to enter his apartment, and he was
trying to keep her out.  Id.  The father testified the child did not see
the exchange, because the father’s girlfriend had taken the boy to the
bathroom–the father was afraid the mother would try to remove the child from
his apartment.  Id.  The father called police, and the mother was
arrested and taken to jail.  Id.  Later, a magistrate issued a
protective order against the mother in favor of the father.  Id.  The
father also testified the mother had assaulted him on two other occasions, but
he did not provide any details with regard to these assaults.  Id.  

The mother testified at the
hearing, admitting she shoved the door and hit the father.  She stated she pled
no contest to criminal trespass.  Id.  The mother, like B.H.M., was
placed on deferred adjudication.  Id.  

Upon review, the court held
that although the evidence would justify a modification of conservatorship, the
trial court was not compelled to order a modification.  Id.  The
appellate court noted the mother presented evidence that she successfully
completed her deferred adjudication, and had successfully completed a
batterer’s intervention and parenting classes.  Id.  The court also
referred to the Department caseworker’s report that there would have to be a
compelling reason to move the child from the home he has always lived in.  Id. 
The appellate court concluded the trial court’s implied finding that it would
be in the best interest to leave the child with the mother was supported by the
evidence.  Id.  

Here, the evidence is
undisputed that M.M. was drunk and angry and B.H.M. found her beating his
youngest son.  B.H.M.’s actions were taken in direct response to the violent
actions of M.M.; he did not instigate the violence.  Like the mother in R.T.H.,
he successfully completed his deferred adjudication, attending the mandated
anger management classes.  Moreover, B.H.M.’s assault of M.M. was in 2006,
approximately three years before M.M.’s death and, after the assault, the
couple continued to care for one another and parent the children together.  

Finally, the psychologist
testified it would not be in C.E.M.-K.’s best interest at that time to remove
her from her sister, B.H.M., and the life she has always known.  Given the
evidence, we hold the trial court’s implied finding that it would be in
C.E.M.-K.’s best interest to remain with B.H.M. was supported by the evidence,
despite the 2006 incident that resulted in B.H.M.’s arrest and deferred
adjudication.   

Conclusion

Based on the foregoing, we
hold: (1) B.H.M. had standing under section 102.003(a)(9) of the Texas Family
Code; (2) the action involving C.E.M.-K. was a modification as opposed to an
original suit, thereby precluding application of the statutory parental
presumption; and (3) the trial court did not abuse its discretion in naming
B.H.M. as C.E.M.-K.’s sole managing conservator.  As to conservatorship, we
therefore overrule J.P.K.’s issues, and we affirm the trial court’s judgment. 
In addition to naming B.H.M. C.E.M.-K.’s sole managing conservator, the trial
court also granted judgment as to a child support arrearage action brought by
C.P.M., Dependent Administrator of the Estate of M.M..  J.P.K. did not raise
any issues relevant to the trial court’s judgment on the arrearages, and
therefore that portion of the judgment is affirmed as well.  

 

Marialyn Barnard, Justice

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 









[1]
Toluene is commonly used as an industrial solvent in the manufacture of
paints, chemicals, pharmaceuticals, and rubber.  Nathanael J. McKewon, D.O., Toluene
Toxicity (last visited Feb. 3, 2011, 4:59 p.m.), http://emedicine.medscape.com/article/818939-overview. 
“Toluene is found gasoline, acrylic paints, varnishes, lacquers, paint
thinners, adhesives, glues, rubber cement, airplane glue, and shoe polish.”  Id. 
Toxicity can result from unintentional or deliberate inhalation of fumes.  Id. 
Toluene abuse, i.e., “glue sniffing,” has become widespread because of its
availability and low cost.  Id.  It is commonly abused by soaking a rag
with paint or other substance containing toluene and placing over the nose and
mouth and inhaling.  Id.  It gives the user a sensation of euphoria.  Id.
 “Sudden sniffing death” has been reported.  Id.





[2]
 J.P.K. also makes reference to B.H.M.’s failure to prove standing under
section 102.003(a)(11), which governs standing in the event a child’s guardian,
managing conservator, or parent is deceased, and section 102.004(b), which
governs standing by grandparents and other intervenors.  See Tex. Fam. Code Ann. §§ 102.003(a)(11), 102.004(b).  However, B.H.M.
never alleged standing under either of these section in his pleadings, though
he does argue on appeal that section 102.003(a)(11) is an alternate ground for
standing.  Given that he did not allege this ground in his pleadings, it will
not support standing.  See H.G., 267 S.W.3d at 123.  





[3]
J.P.K. did not challenge the inapplicability of the parental presumption
in modification actions on constitutional grounds.  He did not raise any
constitutional issues, either below or in this court, on this issue.  Rather,
he relies on the statutory scheme in the Texas Family Code, arguing this is an
original action, not a modification.  Accordingly, it would be inappropriate
for this court to address the possible constitutional issues relevant to the
parental presumption’s absence from Chapter 156 of the Family Code because we
are not permitted to consider unassigned error.  See Western Steel Co. v.
Altenburg, 206 S.W.3d 121, 124 (Tex. 2006) (holding that absent rare
fundamental error, appellate court should refrain from deciding cases on legal
errors not assigned by parties); Allright, Inc. v. Pearson, 735 S.W.2d
240, 240 (Tex. 1987) (same).  





[4]
A “Hobson’s choice” is one in which a person is required to accept one of
two or more equally objectionable alternatives.  Webster’s Ninth New Collegiate Dictionary 574 (1990).  The
phrase is attributed to the actions of Thomas Hobson, a 1631 English liveryman,
who required every customer to choose the horse closest to the door.  Id.