**Adam Rene SOTELO, Appellant,**

v.

**Lorie Eileen GONZALES, Appellee.**

No. 08–04–00185–CV.

Court of Appeals of Texas,
El Paso.

July 28, 2005.

Carol Gregg, Odessa, for Appellant.

Lori Eileen Gonzales, Monahans, pro se.

Greg M. Holly, Monahans, for Appellee.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

## *OPINION*

ANN CRAWFORD McCLURE, Justice.

Adam Rene Sotelo (Sotelo) appeals from a modification order in a suit affecting the parent-child relationship in which the maternal grandmother was appointed a joint managing conservator with the exclusive right to determine the child's primary residence. At issue is the sufficiency of the evidence to rebut the parental presumption. Because the parental presumption is inapplicable in a modification proceeding, we affirm.

## FACTUAL SUMMARY

Adam Drake Sotelo (Adam) was born on Christmas Day in 1999 to Adam Rene Sotelo (Sotelo) and Lorie Eileen Gonzales (Lorie). The family lived together in Odessa, Texas until Lorie and Adam moved to Monahans to live with her parents about a year after the child was born. In April 2001, Sotelo filed a voluntary statement of paternity and sought sole managing conservatorship of Adam. Suit was filed in Ector County, Texas, where Sotelo continued to reside. Lorie filed a counterpetition. In November 2001, Sotelo was adjudicated as Adam's father. Sotelo and Lorie were named joint managing conservators and Lorie was given the exclusive right to establish the primary residence of the child. The court entered a standard possession order.

In April 2003, Sotelo moved to modify the parent-child relationship. He sought the exclusive right to determine Adam's primary residence or, in the alternative, that Adam's residence be restricted to Ector County and contiguous counties. Lorie filed a motion to transfer the cause to Ward County, a motion for writ of possession, a motion to modify the suit affecting the parent-child relationship, a motion for enforcement, and a motion for judgment on child support arrearages.

The trial court issued a writ of possession, finding Lorie was entitled to possession of the child, and transferred the proceedings to the 143rd Judicial District Court of Ward County. The maternal grandparents, Rose and Charles Cartwright, intervened seeking managing conservatorship, possessory conservatorship, or reasonable access. Charles was nonsuited and in February 2004, the trial court appointed Rose as the temporary sole managing conservator. Sotelo and Lorie were appointed temporary possessory conservators. In March, Rose filed a motion for enforcement, complaining that Sotelo and Lorie had failed to return Adam to her.

In April 2004, Peggy Honaker filed a home study with the court. Honaker recommended that Adam be cared for by one of his parents but by that time, Lorie was no longer in the picture. Consequently, she recommended that Sotelo be appointed managing conservator.

The court found that appointment of a parent as sole managing conservator would not be in the best interests of the child because it would significantly impair Adam's physical health or emotional development. The court then appointed Rose and Sotelo as joint managing conservators. Lorie was appointed as possessory conservator. Rose was given the exclusive right to determine the primary residence of the child. This appeal proceeds without benefit of findings of fact and conclusions of law.

In his sole point of error on appeal, Sotelo challenges the sufficiency of the evidence to defeat the parental presumption. As we will explain, the presumption

does not apply in a modification proceeding. We reframe the issue for review as one challenging the sufficiency of the evidence to meet the statutory requirements for modification.

## STANDARD OF REVIEW

■ Most orders arising from a suit affecting the parent-child relationship will not be disturbed on appeal unless the complaining party can demonstrate a clear abuse of discretion. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Lide v. Lide,* 116 S.W.3d 147, 151 (Tex.App.-El Paso 2003, no pet.). However, an appellant may challenge the trial court's findings of fact for legal and factual sufficiency of the evidence. *See Hodson v. Keiser,* 81 S.W.3d 363, 367 (Tex.App.-El Paso 2002, no pet.). In a bench trial where no findings of fact or conclusions of law are filed, the judgment implies all findings of fact necessary to support it. *Pharo v. Chambers County, Texas,* 922 S.W.2d 945, 948 (Tex.1996). Where a reporter's record is filed, however, these implied findings are not conclusive, and an appellant may challenge them by raising both legal and factual sufficiency points. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002). The applicable standard of review is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989).

■ While an appellant may challenge the sufficiency of the evidence to support findings of fact, in most circumstances that is not enough. *Hodson,* 81 S.W.3d at 367. In a case involving these overlapping standards of review, we engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion, and (2) did the trial court err in its application of discretion? *Hodson,* 81 S.W.3d at 367; *Lide,* 116

S.W.3d at 151. The traditional sufficiency inquiry applies to the first question. *Hodson,* 81 S.W.3d at 367; *Lide,* 116 S.W.3d at 151. Once we have determined whether sufficient evidence exists, we must then decide whether the trial court made a reasonable decision. *Hodson,* 81 S.W.3d at 367; *Lide,* 116 S.W.3d at 151. In other words, we must conclude that the ruling was neither arbitrary nor unreasonable. *Hodson,* 81 S.W.3d at 367; *Lide,* 116 S.W.3d at 151.

■ A "no evidence" point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact-finding. *Lide,* 116 S.W.3d at 151; *In the Interest of De La Pena,* 999 S.W.2d 521, 532 (Tex.App.-El Paso 1999, no pet.). When reviewing legal sufficiency, we consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001). If any probative evidence supports the factual finding, it must be upheld. *Hodson,* 81 S.W.3d at 367. "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. *Lide,* 116 S.W.3d at 151. In reviewing an issue asserting that a finding is factually insufficient or against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact, as well as evidence which tends to disprove its existence. *Lide,* 116 S.W.3d at 151. It is for the fact finder to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *Id.*

■ The term "abuse of discretion" is not susceptible to rigid definition. *Hodson,* 81 S.W.3d at 368. The test for an abuse of discretion is not whether, in the

opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles. *Id.* Stated differently, the appropriate inquiry is whether the ruling was arbitrary or unreasonable. *Id.* The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965). An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Lide,* 116 S.W.3d at 152. If, however, the trial court drew an incorrect conclusion of law by misapplying the law to the facts and the controlling findings of fact do not support a correct legal theory sufficient to support the judgment, an abuse of discretion would be shown.

## THE PARENTAL PRESUMPTION

There is a strong presumption that the best interest of a child is served if a natural parent is appointed as a managing conservator. *Lewelling v. Lewelling,* 796 S.W.2d 164 (Tex.1990); *De La Pena,* 999 S.W.2d at 527; *In the Interest of A.D.H.,* 979 S.W.2d 445, 447 (Tex.App.-Beaumont 1998, no pet.); *see also Brook v. Brook,* 881 S.W.2d 297, 299 (Tex.1994); Tex.Fam.Code Ann. § 153.131(a)(Vernon 2002). A parent shall be appointed as sole managing conservator, or the parents as joint managing conservators, unless the court finds the appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. For the court to award managing conservatorship to a non-parent, the non-parent must prove by a preponderance of credible evidence that appointing the parent as a managing conservator would result in serious physical or emotional harm to the child. *In the Interest of M.W.,* 959 S.W.2d 661, 665 (Tex.App.-Tyler 1997, writ denied); *Brook,* 881 S.W.2d at 298. There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm. *M.W.,* 959 S.W.2d at 665. This link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm. *Id.* When a non-parent and a parent are both seeking managing conservatorship, "close calls" go to the parent. *M.W.,* 959 S.W.2d at 666; *Ray v. Burns,* 832 S.W.2d 431, 434 (Tex. App.-Waco 1992, no writ).

This presumption also applies when a non-parent and parent are appointed joint managing conservators of a child but the non-parent is given primary custody. *De La Pena,* 999 S.W.2d at 534. The parent should be awarded primary possession unless such an order would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. *Id.* at 534–35. To hold otherwise would permit the court to apply the presumption in appointing the parent a joint managing conservator but nevertheless choose the primary residence of the child on the basis of a heads-up best interest test, with the court determining which of the parties is the "better" choice. *Id.*

Sotelo relies heavily upon *Lewelling* and *De La Pena* in his argument. In both of these cases, the custody dispute between the parent and non-parent arose in the context of an original suit affecting the parent-child relationship. The instant case involves a modification of a prior order. Consequently, our analysis must be guided

by *In re V.L.K.*, 24 S.W.3d 338 (Tex.2000). There, the Supreme Court explicitly pronounced that "the parental presumption applies only in original custody determinations and not in a modification proceeding." *Id.* at 340. The court further specified that it makes no difference whether the parties to the original proceeding are identical to the parties in the modification suit. *Id.* at 343. Recognizing that the parental presumption is deeply embedded in Texas law, the court concluded that in a modification, the burden of proof derives from Section 156.101. Tex.Fam.Code Ann. § 156.101(a). *Id.* at 342. The current version of the statute applicable to our analysis provides in pertinent part:

> The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:
>
> (1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
>
> (A) the date of the rendition of the order.

Tex.Fam.Code Ann. § 156.101(1)(Vernon 2004–05).

■ In his motion to modify, Sotelo affirmatively pled that "[t]he circumstances of the child, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of rendition of the order to be modified." He does not challenge that element on appeal. Consequently, we must determine whether Rose established that the modification was in Adam's best interest.

As we said in *De La Pena*, custody disputes by their very nature are inherently fact-intensive. *De La Pena*, 999 S.W.2d

at 529. Concepts of psychological parenting, bonding, and the depth of attachments to parent-figures must be viewed in the context of the evidence presented. *Id.* Appellate courts routinely defer to the fact finder at trial concerning matters of credibility and demeanor, but perhaps in no other type of litigation is it more critical. *Id.* In most instances, the fact finder will not hear from the child the subject of the suit; the child's behavior, experiences, fears, joys, and significant attachments will be conveyed through pictures and through the words of other witnesses, both lay and expert. *Id.* The individuals vying for conservatorship may be scrutinized by the fact finder for such intangible signs as an animated smile when describing a child's achievements, a furrowed brow when explaining typical affectionate concern, or even tears when anticipating the emotional impact the outcome of litigation will have on a child. *Id.* Because safety, security, and stability are critical to child development, the danger of uprooting a child is an important factor.

## WAS THE MODIFICATION IN ADAM'S BEST INTEREST?

To prevail, Rose had to establish that it was in Adam's best interest that she be appointed as a managing conservator with the exclusive right to determine the child's primary residence. We now turn to the evidence elicited at trial.

Eddie Terrazas, a manager at a drug screen compliance lab, testified that Sotelo had taken five drug tests. The tests screened for seven specific drugs: amphetamine, barbiturates, benz, cocaine, opiates, PCP, and marijuana. The tests were scheduled by Sotelo and administered on June 9, 2003, March 9, 2004, April 20, 2004, May 13, 2004, and May 21, 2004. No drugs were found in Sotelo's system. Marijuana stays in the system up to four

weeks for a chronic user and seven days for an occasional user; cocaine remains for twelve to forty-eight hours.

Francis Hall, the office manager and assistant director at the Joe Pinner Westside YMCA, knew Sotelo, his mother, and Adam because the child had been enrolled at the facility for several months at a time Hall had an opportunity to observe Adam and did not notice anything that would cause her concern. She did not discern any behavioral problems and thought the child seemed happy. Sotelo would drop off Adam and pick him up. Hall had never seen Lorie or Rose.

Luis Rios, a friend of Sotelo, had an opportunity to observe Sotelo with Adam. Rios thought Sotelo was a good father and he did not see anything that would cause him concern. Rios would not worry about leaving his own children with Sotelo. Rios denied that Sotelo used cocaine or that cocaine had been used at any parties they attended together. He had seen Lorie smoke marijuana around Adam. Lorie, on the other hand, testified that she, Rios, and Sotelo had all used drugs. She and Rios smoked marijuana and all three of them used cocaine.

Social worker Peggy Honaker prepared a home study. She visited the Cartwright home and Sotelo's home and found Adam to be happy, secure, and well-adjusted in both places. She was aware of allegations concerning drug use but she found no indications of it in either home. The Cartwrights had been caring for Adam most of his life and this was a positive thing. She also found that Sotelo played an active role in the boy's life.

Tina Mason is Sotelo's mother. She testified that Sotelo played a positive role in his son's life. Adam lived with Sotelo in the spring of 2003 and from December 29, 2003 until February 9, 2004. During that time, Sotelo dropped off and picked up the child from daycare, cooked for him, and bathed him. In the four months preceding trial, Sotelo had fostered a positive relationship with the child. Adam was excited when he came for weekend visits.

Mason had seen nothing to cause her concern and she denied any knowledge of Sotelo using drugs. She thought his one-bedroom home was clean and well kept. She did not believe Adam would be safe in Lorie's custody. Mason admitted that the child had been living with the Cartwrights for some time but she believed that allowing Adam to live with his father would be a positive and stabilizing experience.

Mason admitted that both times Adam had lived with Sotelo, it had occurred in violation of court orders. She was concerned when the child was in Rose's care. Rose did not put Adam in a car seat and allowed him to jump on the trampoline unsupervised. Mason would pick the child up from the country club where Rose worked and Mason believed this was an inappropriate environment. Adam was always covered with mosquito bites in the summer causing Mason alarm due to the West Nile virus.

Sotelo described his house as having one bedroom and a fenced backyard. He had worked at Big Tex Trailers on the loading dock since January 2004. During the busy season, Sotelo worked approximately sixty hours a week. He had applied for a construction job where he would make more money.

Adam lived with Sotelo and Lorie until he was a year or a year and a half. When the couple split up, the court awarded primary custody to Lorie. Adam lived with Sotelo on two separate occasions in 2003. In March, Lorie dropped him off with Sotelo and left for Houston. Sotelo admitted that the Cartwrights asked him to bring the child back to their house, but

he refused. The court ordered him to return the child. Lorie took Adam back to Sotelo in December. Sotelo testified that he only had an obligation to return Adam to Lorie, and she never asked. He also claimed that Rose had not asked him to bring Adam to her. Once again, it took a court order for Sotelo to surrender the child.

Sotelo believed that Adam should live with him since he was his father. He thought he was capable of taking care of the child. He admitted drug usage in the past but professed he had not done so since he was nineteen or twenty years old. He was twenty-five years old at the time of the trial. On cross-examination, he denied using marijuana since Adam's birth. Adam was four at the time of trial. Sotelo also admitted to having used cocaine. He agreed to undergo random drug testing.

Sotelo exercised most of his weekend visitation and paid child support, even if he had not always paid the full amount due. He also gave Lorie money for rent. He admitted representing on his 2002 and 2003 federal income tax returns that Adam was living with him when he was not.

Harvey Gomez testified that on New Year's Eve 2002, he went to the North Side bar. There were a couple of fights that evening. Sotelo got into a fight defending a friend. Gomez saw a lot of drugs that evening and Sotelo offered to sell him cocaine. But he never saw the drugs in Sotelo's possession and he believed Sotelo was bluffing.

Velma Payan, a teacher at Monahans Head Start, testified that Adam was in her class. He attended class regularly except for missing school in January. Payan described Adam as an easygoing and social child who got along well with teachers and other students. Payan had contact only with Rose and Lorie. Sotelo never contacted her to check on Adam's progress in school. Lorie would attend class parties and drop off and pick the child up from school. Rose volunteered on a daily basis and would eat lunch with Adam. She also attended class parties and was available for conferences. At the beginning, Adam was a little withdrawn and quiet, but he progressed well with his vocabulary and social skills improved. When eating breakfast, the children would often discuss their families. One child said that he wanted to ride a motorcycle like his dad. Adam responded that he wanted to go to bars and get drunk like his dad. Payan never heard Adam mention his father any other time.

Rose Cartwright testified that Adam lived with Sotelo and Lorie for about six months until Adam and Lorie came to live with her. She and her husband provided clothing, food, and medical insurance for Adam as well as a home. She had enrolled the child in Head Start.

When Sotelo failed to return Adam in the spring of 2003, Rose called him and his mother. She went to Odessa and left notes and letters asking that the child be returned. When Lorie again left Adam with Sotelo in December, Rose attempted to contact the child by calling Sotelo's cell number, his mother's number, and leaving notes. She spoke to Sotelo's mother a few times, and she would make excuses as to why Sotelo could not come to the phone.

Rose testified that she did not use drugs. She was concerned about Adam living with Sotelo. The child had attended a party with his father and came home pretending to snort cocaine off a table. Due to the drug issues, Rose believed that placing the child with his father could significantly affect his emotional or physical development. She believed it was in Adam's best interest that she be named managing conservator.

Charles Cartwright testified that he had taken on the responsibility of supporting and raising Adam. He had not used drugs within the last four years but had within the last ten years. Now he was "clean" and would not allow drugs in his house. He agreed that a person could use drugs at one point and then turn it around. He believed it would be in Adam's best interests for Rose to be named managing conservator since Adam's involvement with her had been a positive experience.

Lorie testified that she had moved back with her parents in Monahans when Adam was a year old and the child had lived there ever since. The Cartwrights provided financial support for the child and the whole family cared for him. Lori believed that Adam was safe with her parents and that Rose had the child's best interests at heart. Although she had originally professed that Adam was better off with Sotelo, by the time of trial she thought it was in Adam's best interest for Rose to be his managing conservator.

The evidence is both legally and factually sufficient to established that modification was in Adam's best interest. Sotelo offered to sell Harvey Gomez cocaine in 2002. Sotelo had no involvement in Adam's daily school routine. Adam told his classmates that he wanted to be just like his father and go to bars and get drunk. He pretended to sniff cocaine after attending a party with his father and Sotelo had used cocaine around the child. He had deliberately violated court orders on two separate occasions, necessitating court intervention. As a result of the December 2003 incident, Adam missed a month of school in January 2004.

We acknowledge that the evidence shows that Sotelo frequently exercised his visitation and was perceived to be a good father by friends and family. And while the social worker suggested that Adam live with his father, there was evidence that Adam's visits with Sotelo resulted in disruptive or uncharacteristic behavior. *See* *De La Pena*, 999 S.W.2d at 533. It was the responsibility of the trial court to determine the weight to be given to testimony and to resolve any conflicts. Because there is sufficient evidence of a substantive and probative character to support the appointment of Rose Cartwright as a joint managing conservator with the exclusive right to determine residency, we conclude that the trial court's ruling was neither arbitrary nor unreasonable. Sotelo's sole point is overruled and the judgment of the trial court is affirmed.