COURT OF APPEALS

EIGHTH DISTRICT OF
TEXAS

EL PASO, TEXAS

 

 


 
 
  
 MIGUEL A. MONTENEGRO,
  
                            
 Appellant,
  
 v.
  
 YAMEL AVILA,
  
                            
 Appellee.
 
 
  
   '
     
   '
     
   '
     
   '
     
   '
     
  '
 
  
 
 
  
  
                   No. 08-10-00354-CV
  
 Appeal from the
  
 65th
 Judicial District Court
  
 of El
 Paso County, Texas
  
 (TC#2008CM1304)
  
 
 


 

O P I N I O N

Appellant, Miguel Montenegro (“Montenegro”),
appeals the trial court’s annulment of his marriage to Appellee, Yamel Avila
(“Avila”).  In two issues, Montenegro contends
that the trial court erred because the evidence was legally and factually
insufficient to support an annulment based on fraud.  For the following reasons, we affirm.

PROCEDURAL
BACKGROUND








In
February 2008, Avila filed for an annulment and Montenegro filed a
counterpetition for divorce in the 65th Judicial District Family Law Court.  After an associate judge granted the
parties a divorce, Avila moved for a de
novo hearing.  At a bench trial in October 2010, the trial court granted
an annulment of the marriage based on fraud. 
This appeal followed.




 

FACTUAL
BACKGROUND

At
trial, the parties provided a detailed summary of their courtship and
marriage.  The couple met in November
2003, on an Internet-dating website.  Through
daily emails and telephone calls, Avila learned that Montenegro was an
industrial engineer from Miami, Florida who wanted a spouse, family, and home.  Montenegro learned that Avila was a teacher
in El Paso, Texas who wanted the same things. 
After six months, Montenegro requested that they meet in person.  Avila then learned Montenegro could not travel
to El Paso to see her because he was actually from Bogota, Colombia and was
unable to obtain a tourist visa to enter into the United States.  According to Montenegro, he told Avila that
he was studying engineering and did not represent to her that he was an
engineer, but provided no testimony as to why he was unable to get a visa.

At
Montenegro’s suggestion the couple decided to meet in Juarez, Mexico in June
2004.  At this time, Montenegro brought a
ring and asked Avila to marry him.  Avila
testified that the day after she declined his proposal, Montenegro cut his trip
short and asked her for $200 which she gave to him.  Afterwards, the couple continued talking by
telephone and email.  Montenegro informed
Avila that he would end their relationship if she did not visit him in
Colombia.  In November 2004, Avila traveled
to Colombia.  Again, Montenegro asked Avila
to marry him and this time Avila accepted his marriage proposal.

At Montenegro’s direction, Avila applied for a fiancé visa on his
behalf and paid the corresponding legal fees.  Montenegro joined Avila in the United States,
bringing little to no money with him.  On
September 3, 2005, the couple married in a ceremony, the expense of which was
borne primarily by Avila’s parents.  Montenegro
testified that he married Avila because he loved her and because she was the
kind of partner he had hoped for.  After
the wedding, although Montenegro had 90 days to apply for a two-year conditional
residency card, he immediately went to an attorney to begin the process.  At trial, Montenegro agreed that his
“residence” was very valuable to him.

For
one year, only Avila worked while the couple lived in the home of Avila’s
father.  Avila added Montenegro to her
bank accounts because Montenegro was her husband, and because he told her they
needed proof that they were living together for his immigration purposes.  Avila presented bank statements to show that
from the start of their marriage, Montenegro made monthly withdrawals or
electronic transfers from their bank account that ranged from $100 to $400.  Avila testified that initially these bank
transactions were done without her knowledge or consent.  Montenegro testified that he was sending the
money to his friend in California to pay off a debt he owed and that Avila
learned of the debt and the transactions after they married.  The trial testimony and evidence showed that Montenegro
opened several credit cards and registered a car in his name alone.  According to Avila having good credit was important
to Montenegro because he wanted to show that he was doing well in El Paso.  Montenegro responded that he was new to the
United States and that he did not know how to go about filling out the credit
card applications and that Avila’s family helped him complete the applications
for his credit cards and car title.

Avila
testified that Montenegro often rejected her sexual advances, or made up excuses
to avoid physical intimacy with her.  She
also testified that when they were intimate Montenegro always used condoms and
other protective measures to avoid pregnancy. 
In response, Montenegro explained that he wanted to save money before
starting a family with Avila.  At trial,
Avila produced telephone bills to show that Montenegro’s calls to Columbia were
costing the couple between $510 and $1,341.89 a month.  Montenegro testified he spent money on calls
to Columbia because it was hard being away from his family.  In 2006, Montenegro obtained work at
Southwest Key Corporation.

Avila
stated that she learned through trial discovery that Montenegro had purchased a
life insurance policy in May 2007 using an address in Katy, Texas, but he did
not list her as a beneficiary.  Montenegro
testified that Avila was present when he purchased the policy and that it was in
February 2008 that he changed the address to Katy, Texas and removed Avila as the
beneficiary.  In July 2007, Montenegro
attended job training which taught employees about the Violence Against Women
Act (VAWA).[1]
 On the same day Montenegro completed
the training, he went to a domestic violence shelter and reported that Avila
was abusing him physically, verbally, mentally, and sexually.[2]
  However, no police reports were ever made and Avila
did not learn about these allegations until trial.[3]  Montenegro explained that he went to the
shelter just to learn how to handle the situation and not for a protective
order.  Avila stated that in June and
August 2007, the couple took vacations together and Avila believed Montenegro
was very much in love with her during this time.

In
December 2007, when Montenegro received his permanent green card, he began
acting “strangely” and separated himself from Avila.  That month, and without Avila’s knowledge, Montenegro
obtained a $4,000 cash advance on one of his personal credit cards.  In January and February 2008, Avila overheard Montenegro
say he was “getting everything ready” and noticed that he had taken his car to
Pep Boys.  On February 1, 2008,
Montenegro returned to the domestic violence center and informed the caseworker
that he wanted a divorce because he realized the abuse would not stop.  Montenegro also stated that he “wanted to make
sure that he [would] not get into any legal problems for leaving his
wife.”  The record shows that Montenegro also gave advance notice to his employer about
his relocation to Katy, Texas.

On
February 12, 2008, Avila overheard Montenegro tell his mother, “I’m leaving her
today.”  Avila testified that she was
confused after hearing this, but went to work as usual.  That day, Montenegro called Avila several
times throughout the day and also called her at work to tell her that “he was
busy at work, but that he was okay and he loved her.”  Avila testified that she believed him when he
told her that he loved her.  However, when
she got home from work that day, all of Montenegro’s personal belongings were
gone.  When Avila called Montenegro, he
simply said, “Sorry, but we . . . didn’t make it.”  Montenegro left Avila and went to stay with
some friends in Katy, Texas.  Avila
testified that she would not have married Montenegro if she had known that he
just wanted to get a green card and then he would leave her.  Montenegro explained that he called Avila
because he still loved her and that he left the marriage because they were
fighting more and more and it was becoming intolerable.

Eight
days after Montenegro left Avila, he opened a bank account using the same
address that he had used for the 2007 life insurance policy.  A bank statement was presented at trial to
show that Montenegro’s new account received a deposit of $4,000 from the same
account that he had previously been transferring money as payment of the
alleged debt he owed to a friend in California. 
Avila believed the money that Montenegro had withdrawn from their joint
checking account was not being used to pay off debt as Montenegro claimed, but
instead was being saved for the day Montenegro left her.  Montenegro testified that he borrowed the
money from his friend so that he could get resituated in Katy, Texas.  At trial, Avila testified that it was not
until after February 12, 2008, that she became aware that Montenegro never
loved her, had used her, had tricked her into marrying him, and that since that
date she had not cohabitated with him.  Montenegro
continued to use the marital home mailing address through November 24, 2008,
and Avila testified that she believed he did so for immigration purposes.  She also testified that she would not
have stayed with Montenegro if he had not left her because there were “too many
lies.”

DISCUSSION

In two issues, Montenegro argues that the trial
court erred in granting the annulment because the evidence was legally and
factually insufficient to support findings that: (1) he committed fraud which
induced Avila to marry him; and (2) Avila did not cohabitate with him after
learning of any such fraud.[4]

Standards of Review

In a legal sufficiency review, we consider
the evidence in the light most favorable to the trial court’s findings and we
indulge every reasonable inference that supports those findings.  City of
Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005).  If any probative evidence supports the trial
court’s fact finding, it must be upheld. 
Hodson v. Keiser, 81 S.W.3d 363,
367 (Tex. App. – El Paso 2002, no pet.). 
The decisive test for legal sufficiency is whether the evidence at trial
would allow reasonable and fair-minded people to reach the verdict under
review.  City of Keller, 168 S.W.3d at 827.

In a factual sufficiency review, we reverse
only if the trial court’s findings are so against the great weight and
preponderance of the evidence as to be clearly wrong.  Sotelo
v. Gonzales, 170 S.W.3d 783, 787 (Tex. App. – El Paso 2005, no pet.), citing Lide v.
Lide, 116 S.W.3d 147, 151 (Tex. App. – El Paso 2003, no pet.).  We must consider all the evidence including
that which tends to prove the existence of a vital fact as well as that which
tends to disprove its existence.  Id.

It is for the fact finder to decide the
weight to be given to the testimony and to resolve any conflicts in the
evidence.  Id.  We cannot substitute our
opinion to the contrary of the credibility determinations made by the fact
finder.  City of Keller, 168 S.W.3d at 819. 
The fact finder is the sole judge of the witnesses’ credibility.  Id.

We review conclusions of law de novo. 
BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794
(Tex. 2002).  We will uphold the trial
court’s conclusions if the judgment can be sustained on any legal theory
supported by the evidence.  Id.  Therefore,
erroneous legal conclusions do not require reversal if the trial court reached
the proper judgment.  Id.

Application

Annulment Based on
Fraud

A trial court may grant an annulment to a
party of the marriage if:  (1) the other
party used fraud, duress, or force to induce the petitioner to enter into the
marriage; and (2) the petitioner has not voluntarily cohabited with the other
party since learning of the fraud or since being released from the duress or
force.  Tex.
Fam. Code Ann. § 6.107 (West 2006).

In Issue One, Montenegro argues that the
trial court erred in granting an annulment based on fraud because legally- and
factually-insufficient evidence supported a finding that Montenegro committed
fraud to induce Avila into marriage with him. 
Fraudulent inducement is a type of fraud that occurs when a material
false representation is made and (1) was known to be false when made; (2) was
intended to be acted upon; (3) was relied upon; and (4) caused injury.  Tex. S.
Univ. v. State St. Bank & Trust Co., 212 S.W.3d 893, 914 (Tex. App. – Houston
[1st Dist.] 2007, pet. denied).

Montenegro specifically complains that the
trial court erred in granting an annulment based on fraud because the evidence
was insufficient to support the trial court’s findings that he made fraudulent
representations to Avila about his love for her and desire to raise a family with
her, and that he committed fraud by failing to disclose that he married her to
attain legal immigration status.  In its
findings of fact, the trial court found that: (1) Montenegro falsely
represented his love for Avila and desire to have a family with her; (2)
Montenegro was anxious to marry Avila for reasons other than love and family;
(3) Montenegro saved money without Avila’s knowledge so that he could leave her
as soon as he obtained legal resident status; (4) Montenegro had planned ahead
to leave Avila; (5) Montenegro’s timing of events proved that he committed
fraud by inducing Avila into marriage; (6) Montenegro learned he could use
domestic violence allegations to obtain lawful resident status without having
to rely on Avila; (7) Montenegro’s sole reason for marrying Avila was to obtain
legal resident status in the U.S.; and (8) Montenegro’s failure to disclose his
sole reason for marrying Avila was an omission of material fact intended to
induce her into the marriage.

In its conclusions of law, the trial court determined
that:  (1) Montenegro committed fraud by
inducing Avila into the marriage; (2) Montenegro’s false representations about
love and wanting children affected the essentials of the marriage as they were
the primary reason Avila married Montenegro; (3) Montenegro’s conduct and
activities during the marriage affected the essentials of the marriage, and his
actions showed his love for Avila was false; and (4) Montenegro’s failure to
disclose that he only married Avila to obtain legal resident status affected
the essentials of the marriage.

The evidence supports the trial court’s findings and conclusions
that Montenegro committed fraud by inducing Avila into the marriage by making
false representations about love and wanting children, the essentials of
marriage and failing to disclose that he only married Avila to obtain resident
status.  Avila testified about
Montenegro’s aggressive courtship of Avila, his initial misrepresentations
about his place of residence and career, his desire to be married in the United
States, his knowledge about the immigration process, his lack of desire to be
physically intimate with his spouse as a newlywed, and the vehicle and banking
actions he took which excluded Avila.  At
trial, Montenegro did not refute Avila’s testimony surrounding their courtship
other than to explain that he told Avila he was a student, not an engineer, and
that they had sexual intercourse one time prior to their marriage.  Montenegro stated that Avila was not listed
on his credit cards, vehicle registration, or life insurance policy because
that he did not know how to properly fill out the applications.

Avila also testified about Montenegro’s change in behavior once
he received his permanent green card, and the timing and nature of his domestic
violence allegations.  Montenegro’s conduct
throughout the marriage established a preconceived plan to leave Avila once he
received residence status.  Montenegro
purchased a life insurance policy without listing Avila as a beneficiary, he
distanced himself from Avila once he received his green card, and he was heard
to make comments about his arrangements and departure to his family in
Columbia.  He serviced his car, took out
a significant loan without Avila’s knowledge, and gave advance notice to his
employer of his move to Katy, Texas.

As the trier of the fact
is the sole judge of the credibility of witnesses, the trial court was
permitted to believe Avila’s testimony, and reject Montenegro’s testimony.  See
City of Keller, 168 S.W.3d at 819.  It was the trial court’s duty to determine the weight of the evidence
and resolve any conflicts.  Sotelo, 170 S.W.3d at 787.  In the instant case, Montenegro’s failure to disclose the motivating
reason for wanting to marry Avila, which was to become a permanent legal
resident in the United States, was evidenced by his conduct prior to and during
his marriage to Avila.  See Leax v.
Leax, 305 S.W.3d 22 (Tex. App. – Houston [1st Dist.] 2009, pet. denied)
(fact that wife failed to disclose her previous eight marriages to husband was
sufficient to justify annulment based on fraud to induce him into the marriage);
See Villarreal v. Villarreal, No. 09-09-00319-CV, 2010 WL 2854250 (Tex.
App. – Beaumont July 22, 2010, no pet.) (annulment based on fraud upheld
because content of wife’s internet chats and dating profiles was sufficient
evidence to establish she always intended to leave husband after acquiring his
property and establishing her right to stay in the United States).

The
trial court could have reasonably determined that Montenegro’s conduct prior to
and during the marriage constituted fraud to induce Avila to marry Montenegro
and to stay in the marriage until he became a permanent legal resident and that
Montenegro masked his true intent by making false promises about marriage and
family.  Avila relied on those false
representations and as a result suffered injury.  This is not a case of false representations
of love made to induce one to marry another, rather here Montenegro engaged in
fraud prior to and during the marriage until he received a green card.  The trial court did not err in granting an
annulment.  Issue One is
overruled.

Voluntary Cohabitation

In Issue Two, Montenegro contends that
legally- and factually-insufficient evidence supported a finding that Avila did
not cohabitate with him after learning of any fraud.  Montenegro argues that legally- and factually-insufficient
evidence supported an annulment based on fraud because Avila voluntarily
cohabitated with Montenegro after learning of his immigration status and after becoming dissatisfied with their intimacy and family
planning.

It is undisputed that the couple lived
together as husband and wife in the home of Avila’s father until Montenegro
left Avila on February 12, 2008.  The trial
court found that Avila immediately ceased living with Montenegro since
realizing that “he never intended to have a meaningful relationship or kids
with her, and that his sole intent in marrying her was to obtain an immigration
benefit instead.”  The trial court found that it was not until February 12,
2008, that Avila realized Montenegro did not love her, never intended to have
children with her, and only used her to obtain his legal resident status.  Avila did not cohabitate with Montenegro
since learning of the fraud.

The trial court, as fact finder, was the
sole judge of the credibility of these two witnesses.  See
City of Keller, 168 S.W.3d at 819.  In light of Avila’s trial testimony, we
conclude that there was legally-sufficient evidence to support the trial
court’s finding that Avila did not cohabitate with Avila after learning of
Montenegro’s fraud.  See id.  The trial court’s
findings are not so against the great weight and preponderance of the evidence
as to be clearly wrong and are supported by factually-sufficient evidence.  See
Sotelo, 170 S.W.3d at 787.  Because the evidence was both legally and
factually sufficient to support the trial court’s finding that Avila did not
cohabitate with Montenegro after learning of any fraud, Issue Two is overruled.

CONCLUSION

For the reasons stated above, we affirm the
trial court’s judgment.

 

                                                                        GUADALUPE
RIVERA, Justice

April 11, 2012

 

Before McClure, C.J., Rivera, J., and Antcliff, J.











[1]
VAWA is a federal law which allows battered spouses and children of American
citizens or lawful permanent residents to obtain or keep their lawful status in
the United States independent of their abuser spouse or parents.  8 U.S.C. § 1154 (West 2012).

 





[2]
Montenegro allegedly claimed that Avila insulted, humiliated, and degraded
him.  He also claimed that on a daily
basis Avila forced or pressured him to have sex, pressured him to get her pregnant,
and prevented him from using birth control. 
He also stated that he felt obligated to have sex with Avila.  He was concerned with his legal status when
making these allegations as he told the intake worker that he did not want
legal problems for leaving his wife.

 





[3]
Additionally, we note that the record reflects that two follow-up appointments
were scheduled for August 16 and August 31, 2007, but there is no evidence in
the record showing that Montenegro ever kept the appointments.





[4]
Specifically, Montenegro challenges Findings of Fact Nos. 1, 5, 11, 13, 19, 20,
21, 24, 25, 27, 28, 29, 31, 32, and 33 and Conclusions of Law Nos. 1-5.