

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | |
|---|---|
| § | No. 08-18-00023-CV |
| § | Appeal from the |
| IN THE INTEREST OF S.D.A., A CHILD § | 83rd District Court |
| § | of Terrell County, Texas |
| § | (TC#3148) |
| § | |

## **O P I N I O N**

In this case concerning the custody of child S.D.A., Appellant Julian F. Martinez (S.D.A.'s paternal grandfather) challenges the trial court's order naming Alma Reams (S.D.A's paternal aunt/Julian's adopted daughter) as S.D.A.'s managing conservator.   We will affirm the trial court's judgment.

## **BACKGROUND**

S.D.A. is the child of Shania Ashbaker and David Martinez.[1]   In 2016, Shania and David

---

[1] According to the social worker's report in this case, Shania Ashbaker and David Martinez were never married. Before S.D.A. was born, Shania and David broke up, and Shania began dating Robert Alexander. S.D.A. was born during Shania's relationship with Robert and Robert identified himself as Shania's common-law husband and S.D.A.'s presumed father in the initial pleadings of this case.   Following S.D.A.'s birth, Shania ended her relationship with Robert, and she and David decided to reconcile.   Genetic testing undertaken during these proceedings revealed David Martinez was S.D.A.'s biological father.   Robert Alexander was no longer a party to this case by the time it went to trial.

were murdered. Following the death of S.D.A.'s parents, David's father Julian, took possession of S.D.A. on August 22, 2016, filed a petition for managing conservatorship as S.D.A.'s grandfather, and obtained an order naming him S.D.A.'s nonparent sole managing conservator. Julian's conservatorship over S.D.A. was later challenged by several relatives. As is relevant to this appeal, Alma Reams intervened in the custody battle over S.D.A. Alma Reams is the older sister, by fifteen years, of David; the adopted daughter of Julian; and S.D.A.'s paternal aunt. Alma and Julian eventually became the two main relatives seeking conservatorship of S.D.A. The focus of the dispute on appeal is whether the trial court erred by (1) switching conservatorship of S.D.A. from her grandfather Julian to her aunt Alma and (2) denying Julian unsupervised access to S.D.A. At the time of trial, S.D.A. was approximately two years old.

### Evidence at Trial

For organizational purposes, we will divide up our discussion of the trial evidence into three parts: (1) evidence presented by Alma Reams; (2) evidence presented by Julian Martinez; and (3) evidence from S.D.A.'s guardian ad litem and a caseworker appointed by the trial court.

### Alma's Case

Alma Reams testified that she is S.D.A.'s aunt, David's brother, and Julian's adopted daughter. Alma resided in Georgetown, but was awarded visitation of S.D.A. in Sanderson, which is a seven-hour drive from her home. Alma admitted that she was unable to attend nine scheduled visits with S.D.A. due to various family and personal obligation.

Alma testified that she and her husband have a four-bedroom house in Georgetown. She and her husband sleep in one bedroom, her daughter had a room, her son had a room, and the fourth bedroom was empty. Alma stated that she asked her children how they felt about the family

2

taking in S.D.A., and that her two children and her husband were excited. She further stated that her ultimate goal was to adopt S.D.A. in the future.

Alma testified that Julian sexually abused her in middle school and high school. She recounted that he would "do things like lay on top of me" and that Julian would see her from down the hall, walk toward her, push her on the bed, pretend to unbutton his pants, and say "Do you want to feel like how it feels to be raped?" She would kick him and push him and tell him to get off of her, and he would start buttoning his pants, laugh, and walk away. She also testified that Julian would punch her, slap her, verbally abuse her, and open the shower curtains while she was showering and laugh. She testified that Julian would talk sexually about teenage girls, including her friends and neighbors. Julian would also prevent Alma from talking to anyone he thought might be related to her biological father. Alma did not tell her mother about these allegations until within a year and a half of trial, she did not tell her mother about her allegations during the divorce because she wanted to protect her brothers and because she was afraid of Julian.

Alma testified that the relationship between Julian and her brother David was "awful" and Julian would make comments about David's weight and call him a pig and stupid. Alma also admitted that she does not get along with Julian's current wife Elizabeth.

### *Julian's Case*

Julian Martinez obtained possession of S.D.A. in August 2016 on the day of Shania and David's death. Julian testified that he was common-law married to Elizabeth and that although he had not yet formally married Elizabeth, he has filed common law marriage documentation at the courthouse. Julian stated that he made over $100,000 a year as a field service technician for a company that maintained and operated field compression units Mondays through Fridays from

3

around seven in the morning to six or seven in the evening, and he was on-call every other weekend, though his work hours could be variable. Julian's wife Elizabeth had worked at Dairy King, but at the time of trial the business was closed and Elizabeth was out of work. Elizabeth would watch S.D.A. while Julian was at work, and Elizabeth's mother would watch S.D.A. if Julian and Elizabeth were unavailable. Julian provided insurance for S.D.A. through his employment. Julian testified that he would eat meals with S.D.A. on weekends, do playtime every evening, and read her kid stories and Bible stories. According to Julian, S.D.A. was bonded to Elizabeth and called her "mother" or "memaw."

Julian testified that S.D.A. suffered from water-warts but that he had taken her to the doctor, who told him to use Neosporin to keep them from spreading or turning into a staph infection. He further testified that he and Elizabeth also use natural remedies like apple cider vinegar to manage S.D.A.'s condition. According to Julian, S.D.A. is allergic to strawberries, all tomatoes, and red and purple grapes.

Julian denied ever making unwanted sexual advances toward anyone. He also specifically denied Alma's allegations of physical and sexual abuse. He also denied ever abusing David or making comments about his weight. Julian testified that he was forthcoming about sexual abuse allegations made by his ex-girlfriend's daughter, but he maintained that those allegations were false. According to Julian, he was never arrested, and he and his attorney made attempts to speak with law enforcement about the allegations, but law enforcement cancelled the meetings and the 83rd District Attorney's Office issued a declination letter.

Elizabeth Birkenfeld Martinez identified herself as Julian's wife at the hearing. She disputed characterizations of her marriage in the child custody assessment about her marriage

4

being on again and off again, maintain that her and Julian's relationship had been consistent and was not a marriage of convenience. Elizabeth was married to her first husband until 2000, and she had four children, all of whom were adults at the time of the hearing. Elizabeth was married to her second husband from 2009 to 2015, when he died. She and Julian had been cohabiting since June 2015. She had been working part-time at Dairy King from 11 a.m. to 2 p.m. but had not been working recently because the owner of the business was ill. Elizabeth participated in interviews with child custody evaluator Kimberly Ilse and guardian ad litem Gail Schroeter. Elizabeth disputed an assertion in the child custody report stating that she had not turned over certain documents or criminal records, testifying that she had attempted to provide those materials but her attempts were unsuccessful for various reasons.

Elizabeth admitted that she had been arrested for passing hot checks but testified that the reason she had issues with hot checks was because once her first husband withdrew all the money in an account without telling her, and her second husband was not good with finances. Elizabeth also lost her job with her former employer because money had gone missing, though she testified she cooperated with law enforcement, allowed her home to be searched, and was never arrested for theft. She denied using illegal drugs or abusing prescription drugs, but she did admit to smoking cigarettes, though not around S.D.A. She testified that she and Alma Reams did not get along, and that Alma "lashes out" at her.

Elizabeth testified that Julian was "very active" with S.D.A. and that he would read to her and play with her. She stated that she and Julian both took care of S.D.A. Elizabeth further testified that while she was aware of the allegations made against Julian, that she had not observed anything that would make her nervous with him being around Elizabeth's own daughter, young

5

children, or young girls. Elizabeth described an altercation with Alma at Dairy King in which Elizabeth had asked Alma what she fed S.D.A. the night before because S.D.A. had been throwing up. Alma named several fruits, Elizabeth told Alma that S.D.A. was allergic to those fruits, Alma repeatedly told Elizabeth that she needed to tell her about S.D.A.'s allergies, Elizabeth walked away, and Alma called the sheriff's department.

The court also heard other testimony from Julian's family members, including Alma's brother, in which the witnesses testified as to Julian's interactions with S.D.A.

*Testimony from the Caseworkers*

Kimberly Ilse, an intermediate school counselor and social study evaluator, performed a case study in connection with this matter. Both parties stipulated that she would testify as an expert. In her interview with Alma, Alma relayed her allegations against Julian. She visited Alma house, where she observed Alma and her husband interacting with their children. Ilse described the family as being strong, with the children being happy, "very strong," "very polite," "very well-spoken," and "very sure of who they were" and Alma and her husband Ben being very "united." Their children were also included as part of the decision-making process. Neither Alma or Ben had any issues relating to alcohol or drug abuse, criminal history, or involvement with CPS. Ilse described their home in Georgetown as being in a quiet neighborhood, with an extra bedroom ready for S.D.A. Alma provided strong character references. Ilse found Alma to be credible. Ilse was able to witness S.D.A. interacting with the Reams family at a restaurant. Although the interaction was only for half an hour, Ilse said that S.D.A. seemed very happy with no distress whatsoever. Ilse did not believe that Alma not exercising the rights to all her visits reflected adversely on her, given that Alma had commitments to her children she needed to attend

6

to and given that the driving time between her home in Georgetown and Sanderson was approximately seven hours.

With respect to Julian and Elizabeth, Ilse testified that she conducted a home visit lasting about two hours. She testified that Julian had a lot of family in Sanderson and that he had a good job and that he was home most nights, although sometimes he worked long hours and had to travel for work. She had no concerns regarding physical or mental health.

During the home visit, she observed Elizabeth mostly taking care of S.D.A. Ilse visited another time and observed S.D.A. watching television and playing with her toys, but there did not seem to be a lot of interaction. When she interviewed Julian and Elizabeth together, Ilse felt like their responses were very calculated, with Julian and Elizabeth looking at each other as if they were trying to verify with each other what they were saying. She said that she believed Julian and Elizabeth had a marriage of convenience and that their interactions seemed rehearsed. Ilse testified that Julian and Elizabeth did not provide her with any character references.

Ilse did not find any criminal history against Julian, but she did recount several allegations of sexual impropriety made against Julian that she uncovered during her investigation. For example, she learned that the daughter of a woman Julian had dated had made an outcry against Julian, and Ilse was able to obtain a police report from the Fort Stockton Police Department regarding allegations. However, the police report noted there was insufficient evidence to support going forward, and although Ilse learned there had been other investigations into Julian, she was unable to obtain any records. She testified that there had been other allegations against Julian which concerned her, but she conceded that nothing has ever been proven. She felt that Julian had not been truthful or forthright with her about these allegations.

Ilse recommended that S.D.A. be placed with Alma and Ben Reams. She testified that with respect to Julian, supervised visitation would be appropriate but no overnight visitation should be permitted. Ilse did not feel that at that point in time S.D.A. was in danger, but that she "starts getting to be somewhere like nine or ten, then things are going to start happening, probably" based on the nature of the allegations against Julian.

Gail Schroeter was S.D.A.'s guardian ad litem. She testified that she had asked Julian about the allegations, and that he said that the allegation was related to touching a child, but that he was just wrestling with the child and that the allegation was made by the mother, who wanted money. Julian did tell Schroeter that during a CPS investigation, CPS had found "reason to believe" allegations against Julian. Schroeter also testified that Elizabeth had said that her first husband was a registered sex offender. Schroeter testified that she was familiar with Julian's reputation in the community with the regards to the sexual allegations. According to Schroeter, Julian had a negative reputation in town and that "[p]eople associated his name with sexual misconduct and pedophilia." She recommended that Alma Reams receive custody of S.D.A.

### The Trial Court's Ruling

In granting sole conservatorship to Alma Reams and denying Julian Martinez unsupervised visitation with S.D.A., the trial court made numerous findings of fact, including in relevant part:

- Julian F. Martinez['s] past and present behavior raises concerns regarding the emotional and physical danger to the child now and in the future.

- Julian F. Martinez's acts and/or omissions indicate that the existing parent-child relationship is not a proper one. Various young females, including Alma Reams, have made allegations against Julian Martinez concerning inappropriate sexual behavior directed toward them. The Court finds that structuring a forced visitation schedule for S.D.A. and Julian Martinez is not in the best interest of the child.

## DISCUSSION

Julian Martinez raises two issues on appeal. In Issue One, he contends that the trial court abused its discretion by not naming him as sole or joint managing conservator because his conservatorship is in S.D.A.'s best interest. In Issue Two, he asserts that the trial court relied on the wrong statute in determining whether he, as S.D.A.'s grandfather, should have access to or possession of S.D.A.

We will begin by resolving the issue of what law applies in this scenario.

### *Standard of Review and Applicable Law*

Trial courts have wide discretion when deciding matters of custody, control, possession, support, or visitation. *In Interest of J.H. III*, 538 S.W.3d 121, 123 (Tex.App.—El Paso 2017, no pet.). We review conservatorship determinations for abuse of discretion. *Id*. In a case such as this one involving the overlapping abuse-of-discretion and legal/factual sufficiency standards of review, we engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? *Sotelo v. Gonzales*, 170 S.W.3d 783, 787 (Tex.App.—El Paso 2005, no pet.). The traditional sufficiency inquiry applies to the first question. *Id*. Once we have determined whether sufficient evidence exists, we must then decide whether the trial court made a reasonable decision. *Id*. An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id*. If, however, the trial court drew an incorrect conclusion of law by misapplying the law to the facts and the controlling findings of fact do not support a correct legal theory sufficient to support the judgment, an abuse of discretion would be shown. *Id*. The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not

9

demonstrate that an abuse of discretion has occurred. *Id*. at 787-88.

If both parents of a child are deceased, the court may consider appointment of a parent, sister, or brother of a deceased parent as a managing conservator of the child, but that consideration does not alter or diminish the discretionary power of the court. TEX.FAM.CODE ANN. § 153.431. A nonparent seeking conservatorship of a child must show by a preponderance of the evidence that the nonparent's appointment as sole managing conservator or joint managing conservator would be in the child's best interest. TEX.FAM.CODE ANN. §§ 105.005; 153.002.[2]

The best interest of the child is always the primary consideration in determining issues of conservatorship and possession. TEX.FAM.CODE ANN. § 153.002. Courts may use the non-exhaustive list of *Holley* factors to determine the child's best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also In re Doe 2*, 19 S.W.3d 278, 282 n.20 (Tex. 2000) (recognizing that intermediate courts employ the *Holley* factors to ascertain best interest in conservatorship cases); *Howe v. Howe*, 551 S.W.3d 236, 259 (Tex.App.—El Paso 2018, no pet.). Those factors include, but are not limited to:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

    (E)    the programs available to assist these individuals to promote the best interest of the child;

    (F)    the plans for the child by these individuals or by the agency seeking

---

[2] There is a strong presumption that the best interest of the child is served if a natural parent is appointed as managing conservator, and when a nonparent seeks to be appointed as a sole or joint managing conservator, the nonparent must overcome this presumption by showing that appointment of the parent as managing conservator would result in serious physical or emotional harm to the child.

custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 371-72.   These considerations are not exhaustive.   *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Holley*, 544 S.W.2d at 372.

*Conservatorship*

We address the conservatorship issue first.   The trial court found that Alma should be S.D.A.'s sole managing conservator.   To overturn the trial court's decision and obtain the judgment he seeks, Julian must show that the trial court abused its discretion by naming Alma as sole managing conservator and not naming Julian as sole or joint managing conservator.   We cannot say the trial court abused its discretion in rendering its conservatorship decision.

In support of his assertion that he should have been awarded conservatorship, Julian points to the following facts:

- Julian maintained custody of S.D.A. for approximately fourteen months and was her primary caregiver before trial, and several witnesses testified that S.D.A. was cared for and not in immediate danger.   He has denied the allegations of sexual misconduct, and he asserts that the allegations made against him of sexual impropriety with young girls are unsupported by any credible evidence.

- Alma only visited S.D.A. nine or ten times out of nineteen possible periods in which she could have visited.

- Alma testified she would allow S.D.A. to stay with her biological mother's brother Kevin, even though Kevin was allegedly an alcoholic.

- Testimony established that Julian plays with S.D.A., does age-appropriate things with her, and cares for her.

11

- Julian has resided in Sanderson for many years, whereas Alma has moved twice while living in Georgetown. Julian had longstanding connections and family members in Sanderson.

Alma counters that the trial court was justified in awarding her sole managing conservatorship not only because she and her husband have a stable marriage and two children described as "very strong," "very polite," and "very well-spoken" and because she intended to allow S.D.A. to have a relationship with her maternal grandparents, but also because Julian sexually abused Alma while she was growing up and that there have been numerous allegations of sexual impropriety made against him regarding his interactions with young girls.

The sexual impropriety allegations form the center of gravity in this dispute. Julian strenuously asserts we should give them no credence here, since none of his accusers were present to testify. Putting aside the allegations contained in the social worker's report, Alma testified in person at trial that Julian had sexually abused her. Julian argues that her claims of sexual abuse are not credible because Alma never reported them to anyone until around the same time the custody suit began, and that the only person she did tell about the abuse—her mother—was unavailable to corroborate Alma's claims at trial. Credibility determinations are a matter for the trial court, not this Court. As between Julian and Alma, the trial court was free to believe Alma and disbelieve Julian. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014)(credibility determinations are within the trial court's province).

Alma's testimony that Julian sexually abused her provided the trial court with a legally sufficient basis on which to exercise its discretion against Julian. Further, the evidence established that Alma and her husband had a stable, loving home and could provide for S.D.A.'s future physical and emotional health and wellness, meaning that the trial court was also free to

12

exercise its discretion in Alma's favor on this point. We discern no reversible error.

Issue One is overruled.

*Access*

In Issue Two, Julian argues that notwithstanding any conservatorship issues, the trial court erred by failing to issue an order allowing him to have unsupervised grandparent access to S.D.A. We disagree.

Julian's argument largely revolves around the assertion that the trial court erred by applying a presumption against him obtaining access that applies only when a parent objects to grandparent access. Specifically, TEX.FAM.CODE ANN. § 153.433 provides that a grandparent may obtain an order granting the grandparent reasonable possession of or access to a grandchild over the parent's objection if, inter alia, the grandparent establishes by a preponderance of the evidence that denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being. *See* TEX.FAM.CODE ANN. § 153.433(a)(2). Julian maintains that, to the extent the trial court required him to show harm to S.D.A.'s physical health or emotional well-being by a preponderance of the evidence per Section 153.433, the trial court erred, because no parent was alive to object to his visitation rights.

Julian is correct that the trial judge did reference TEX.FAM.CODE ANN. § 153.433 as "guidance" in fashioning his visitation decision. Julian is also correct that Section 153.433 is apparently inapplicable here because the presumption it creates in favor of a parent's decision to deny access to a child is ostensibly predicated on the existence of at least one living parent who objects to access. *Cf. id*. at 153.433(a)(1)(applies if at the time relief is requested, at least one biological or adoptive parent of the child has not had that parent's parental rights terminated).

13

However, the trial court filed findings of fact and conclusions of law in this case, and it is those findings we ordinarily review in assessing whether the trial judge incorrectly applied the law. Julian does not explain how the trial court's stray remark mentioning Section 153.433 in comments at the final hearing showed the trial court ultimately incorrectly applied the law in its findings.

Julian cites *In re Smith* for the proposition that it is not necessary to prove that the child's physical health or emotional well-being would be significantly impaired if the grandparent's access were denied. *In re Smith*, 260 S.W.3d 568, 574 (Tex.App.—Houston [14th Dist.] 2008, orig. proceeding). Julian stretches *Smith* too far. *Smith* involved a paternal grandfather and his wife who argued that they should receive the benefit of the parental presumption in a custody fight with the child's paternal grandmother. The Fourteenth Court held that grandparents were not "parents" for purposes of the statute and thus were not entitled to a presumption that they were acting in the child's best interest, even if they were managing conservators. *Id*. at 574. At most, *Smith* stands for the proposition that Julian cannot use the parental presumption against Alma. *Smith* does not alleviate Julian from showing his access to S.D.A. is in her best interest, nor does it prevent the trial court from considering S.D.A.'s physical health or emotional well-being in making that assessment.

Julian may not have to directly show that denying him access to S.D.A. would significantly impair her physical health or emotional well-being under Section 153.433 in order to obtain possession or control of S.D.A. But to the extent that Julian is arguing he is excused from addressing S.D.A.'s physical health or emotional well-being at all simply because her parents are dead, Julian is wrong. The emotional and physical needs of the child are quintessential best

14

interest considerations, and the trial court was free to consider them even if it wrongfully characterized its consideration of these factors as being guided by a non-applicable statute. Both Julian and Alma agree that as nonparents, there is no legal presumption that either one of them will act in S.D.A.'s best interest. And best interest is the standard we must apply here.

The trial court allowed Julian to have restricted access to S.D.A. We review that decision for abuse of discretion. We find that the trial court did not abuse its discretion. The trial court explained its reasoning for not allowing a forced visitation schedule as follows:

> Julian F. Martinez's acts and/or omissions indicate that the existing parent-child relationship is not a proper one. Various young females, including Alma Reams, have made allegations against Julian Martinez concerning inappropriate sexual behavior directed toward them. The Court finds that structuring a forced visitation schedule for S.D.A. and Julian Martinez is not in the best interest of the child.

Again, Julian's arguments regarding visitation hinge on his assertion that there is no credible evidence to support the allegations of sexual impropriety with young girls. Again, we note that Alma testified, and the trial court was free to evaluate credibility and demeanor issues as between Alma and Julian and to render judgment accordingly. There are no grounds for reversal on the record before us.

Issue Two is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.


September 25, 2019

                              YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.
McClure, C.J., (Not Participating)


15