COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| MIGUEL A. MONTENEGRO, | § | No. 08-10-00354-CV |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 65th Judicial District Court |
| YAMEL AVILA, | § | |
| | § | of El Paso County, Texas |
| Appellee. | § | (TC#2008CM1304) |
| | § | |

## **O P I N I O N**

Appellant, Miguel Montenegro ("Montenegro"), appeals the trial court's annulment of his marriage to Appellee, Yamel Avila ("Avila"). In two issues, Montenegro contends that the trial court erred because the evidence was legally and factually insufficient to support an annulment based on fraud. For the following reasons, we affirm.

## **PROCEDURAL BACKGROUND**

In February 2008, Avila filed for an annulment and Montenegro filed a counterpetition for divorce in the 65th Judicial District Family Law Court. After an associate judge granted the parties a divorce, Avila moved for a *de novo* hearing. At a bench trial in October 2010, the trial court granted an annulment of the marriage based on fraud. This appeal followed.

**FACTUAL BACKGROUND**

At trial, the parties provided a detailed summary of their courtship and marriage. The couple met in November 2003, on an Internet-dating website. Through daily emails and telephone calls, Avila learned that Montenegro was an industrial engineer from Miami, Florida who wanted a spouse, family, and home. Montenegro learned that Avila was a teacher in El Paso, Texas who wanted the same things. After six months, Montenegro requested that they meet in person. Avila then learned Montenegro could not travel to El Paso to see her because he was actually from Bogota, Colombia and was unable to obtain a tourist visa to enter into the United States. According to Montenegro, he told Avila that he was studying engineering and did not represent to her that he was an engineer, but provided no testimony as to why he was unable to get a visa.

At Montenegro's suggestion the couple decided to meet in Juarez, Mexico in June 2004. At this time, Montenegro brought a ring and asked Avila to marry him. Avila testified that the day after she declined his proposal, Montenegro cut his trip short and asked her for $200 which she gave to him. Afterwards, the couple continued talking by telephone and email. Montenegro informed Avila that he would end their relationship if she did not visit him in Colombia. In November 2004, Avila traveled to Colombia. Again, Montenegro asked Avila to marry him and this time Avila accepted his marriage proposal.

At Montenegro's direction, Avila applied for a fiancé visa on his behalf and paid the corresponding legal fees. Montenegro joined Avila in the United States, bringing little to no money with him. On September 3, 2005, the couple married in a ceremony, the expense of which was borne primarily by Avila's parents. Montenegro testified that he married Avila because he loved her and because she was the kind of partner he had hoped for. After the wedding, although

2

Montenegro had 90 days to apply for a two-year conditional residency card, he immediately went to an attorney to begin the process. At trial, Montenegro agreed that his "residence" was very valuable to him.

For one year, only Avila worked while the couple lived in the home of Avila's father. Avila added Montenegro to her bank accounts because Montenegro was her husband, and because he told her they needed proof that they were living together for his immigration purposes. Avila presented bank statements to show that from the start of their marriage, Montenegro made monthly withdrawals or electronic transfers from their bank account that ranged from $100 to $400. Avila testified that initially these bank transactions were done without her knowledge or consent. Montenegro testified that he was sending the money to his friend in California to pay off a debt he owed and that Avila learned of the debt and the transactions after they married. The trial testimony and evidence showed that Montenegro opened several credit cards and registered a car in his name alone. According to Avila having good credit was important to Montenegro because he wanted to show that he was doing well in El Paso. Montenegro responded that he was new to the United States and that he did not know how to go about filling out the credit card applications and that Avila's family helped him complete the applications for his credit cards and car title.

Avila testified that Montenegro often rejected her sexual advances, or made up excuses to avoid physical intimacy with her. She also testified that when they were intimate Montenegro always used condoms and other protective measures to avoid pregnancy. In response, Montenegro explained that he wanted to save money before starting a family with Avila. At trial, Avila produced telephone bills to show that Montenegro's calls to Columbia were costing the couple between $510 and $1,341.89 a month. Montenegro testified he spent money on calls to

3

Columbia because it was hard being away from his family. In 2006, Montenegro obtained work at Southwest Key Corporation.

Avila stated that she learned through trial discovery that Montenegro had purchased a life insurance policy in May 2007 using an address in Katy, Texas, but he did not list her as a beneficiary. Montenegro testified that Avila was present when he purchased the policy and that it was in February 2008 that he changed the address to Katy, Texas and removed Avila as the beneficiary. In July 2007, Montenegro attended job training which taught employees about the Violence Against Women Act (VAWA).[1] On the same day Montenegro completed the training, he went to a domestic violence shelter and reported that Avila was abusing him physically, verbally, mentally, and sexually.[2] However, no police reports were ever made and Avila did not learn about these allegations until trial.[3] Montenegro explained that he went to the shelter just to learn how to handle the situation and not for a protective order. Avila stated that in June and August 2007, the couple took vacations together and Avila believed Montenegro was very much in love with her during this time.

In December 2007, when Montenegro received his permanent green card, he began acting "strangely" and separated himself from Avila. That month, and without Avila's knowledge, Montenegro obtained a $4,000 cash advance on one of his personal credit cards. In January and

---

[1] VAWA is a federal law which allows battered spouses and children of American citizens or lawful permanent residents to obtain or keep their lawful status in the United States independent of their abuser spouse or parents. 8 U.S.C. § 1154 (West 2012).

[2] Montenegro allegedly claimed that Avila insulted, humiliated, and degraded him. He also claimed that on a daily basis Avila forced or pressured him to have sex, pressured him to get her pregnant, and prevented him from using birth control. He also stated that he felt obligated to have sex with Avila. He was concerned with his legal status when making these allegations as he told the intake worker that he did not want legal problems for leaving his wife.

[3] Additionally, we note that the record reflects that two follow-up appointments were scheduled for August 16 and August 31, 2007, but there is no evidence in the record showing that Montenegro ever kept the appointments.

February 2008, Avila overheard Montenegro say he was "getting everything ready" and noticed that he had taken his car to Pep Boys. On February 1, 2008, Montenegro returned to the domestic violence center and informed the caseworker that he wanted a divorce because he realized the abuse would not stop. Montenegro also stated that he "wanted to make sure that he [would] not get into any legal problems for leaving his wife." The record shows that Montenegro also gave advance notice to his employer about his relocation to Katy, Texas.

On February 12, 2008, Avila overheard Montenegro tell his mother, "I'm leaving her today." Avila testified that she was confused after hearing this, but went to work as usual. That day, Montenegro called Avila several times throughout the day and also called her at work to tell her that "he was busy at work, but that he was okay and he loved her." Avila testified that she believed him when he told her that he loved her. However, when she got home from work that day, all of Montenegro's personal belongings were gone. When Avila called Montenegro, he simply said, "Sorry, but we . . . didn't make it." Montenegro left Avila and went to stay with some friends in Katy, Texas. Avila testified that she would not have married Montenegro if she had known that he just wanted to get a green card and then he would leave her. Montenegro explained that he called Avila because he still loved her and that he left the marriage because they were fighting more and more and it was becoming intolerable.

Eight days after Montenegro left Avila, he opened a bank account using the same address that he had used for the 2007 life insurance policy. A bank statement was presented at trial to show that Montenegro's new account received a deposit of $4,000 from the same account that he had previously been transferring money as payment of the alleged debt he owed to a friend in California. Avila believed the money that Montenegro had withdrawn from their joint checking account was not being used to pay off debt as Montenegro claimed, but instead was being saved for

5

the day Montenegro left her. Montenegro testified that he borrowed the money from his friend so that he could get resituated in Katy, Texas. At trial, Avila testified that it was not until after February 12, 2008, that she became aware that Montenegro never loved her, had used her, had tricked her into marrying him, and that since that date she had not cohabitated with him. Montenegro continued to use the marital home mailing address through November 24, 2008, and Avila testified that she believed he did so for immigration purposes. She also testified that she would not have stayed with Montenegro if he had not left her because there were "too many lies."

## DISCUSSION

In two issues, Montenegro argues that the trial court erred in granting the annulment because the evidence was legally and factually insufficient to support findings that: (1) he committed fraud which induced Avila to marry him; and (2) Avila did not cohabitate with him after learning of any such fraud.[4]

### Standards of Review

In a legal sufficiency review, we consider the evidence in the light most favorable to the trial court's findings and we indulge every reasonable inference that supports those findings. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). If any probative evidence supports the trial court's fact finding, it must be upheld. *Hodson v. Keiser*, 81 S.W.3d 363, 367 (Tex. App. – El Paso 2002, no pet.). The decisive test for legal sufficiency is whether the evidence at trial would allow reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827.

In a factual sufficiency review, we reverse only if the trial court's findings are so against

---

[4] Specifically, Montenegro challenges Findings of Fact Nos. 1, 5, 11, 13, 19, 20, 21, 24, 25, 27, 28, 29, 31, 32, and 33 and Conclusions of Law Nos. 1-5.

6

the great weight and preponderance of the evidence as to be clearly wrong. *Sotelo v. Gonzales*, 170 S.W.3d 783, 787 (Tex. App. – El Paso 2005, no pet.), *citing Lide v. Lide*, 116 S.W.3d 147, 151 (Tex. App. – El Paso 2003, no pet.). We must consider all the evidence including that which tends to prove the existence of a vital fact as well as that which tends to disprove its existence. *Id*.

It is for the fact finder to decide the weight to be given to the testimony and to resolve any conflicts in the evidence. *Id*. We cannot substitute our opinion to the contrary of the credibility determinations made by the fact finder. *City of Keller*, 168 S.W.3d at 819. The fact finder is the sole judge of the witnesses' credibility. *Id*.

We review conclusions of law *de novo*. *BMC Software Belgium*, *N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We will uphold the trial court's conclusions if the judgment can be sustained on any legal theory supported by the evidence. *Id.* Therefore, erroneous legal conclusions do not require reversal if the trial court reached the proper judgment. *Id.*

## Application

### Annulment Based on Fraud

A trial court may grant an annulment to a party of the marriage if: (1) the other party used fraud, duress, or force to induce the petitioner to enter into the marriage; and (2) the petitioner has not voluntarily cohabited with the other party since learning of the fraud or since being released from the duress or force. TEX. FAM. CODE ANN. § 6.107 (West 2006).

In Issue One, Montenegro argues that the trial court erred in granting an annulment based on fraud because legally- and factually-insufficient evidence supported a finding that Montenegro committed fraud to induce Avila into marriage with him. Fraudulent inducement is a type of fraud that occurs when a material false representation is made and (1) was known to be false when made; (2) was intended to be acted upon; (3) was relied upon; and (4) caused injury. *Tex. S. Univ.*

7

*v. State St. Bank & Trust Co.*, 212 S.W.3d 893, 914 (Tex. App. – Houston [1st Dist.] 2007, pet. denied).

Montenegro specifically complains that the trial court erred in granting an annulment based on fraud because the evidence was insufficient to support the trial court's findings that he made fraudulent representations to Avila about his love for her and desire to raise a family with her, and that he committed fraud by failing to disclose that he married her to attain legal immigration status. In its findings of fact, the trial court found that: (1) Montenegro falsely represented his love for Avila and desire to have a family with her; (2) Montenegro was anxious to marry Avila for reasons other than love and family; (3) Montenegro saved money without Avila's knowledge so that he could leave her as soon as he obtained legal resident status; (4) Montenegro had planned ahead to leave Avila; (5) Montenegro's timing of events proved that he committed fraud by inducing Avila into marriage; (6) Montenegro learned he could use domestic violence allegations to obtain lawful resident status without having to rely on Avila; (7) Montenegro's sole reason for marrying Avila was to obtain legal resident status in the U.S.; and (8) Montenegro's failure to disclose his sole reason for marrying Avila was an omission of material fact intended to induce her into the marriage.

In its conclusions of law, the trial court determined that: (1) Montenegro committed fraud by inducing Avila into the marriage; (2) Montenegro's false representations about love and wanting children affected the essentials of the marriage as they were the primary reason Avila married Montenegro; (3) Montenegro's conduct and activities during the marriage affected the essentials of the marriage, and his actions showed his love for Avila was false; and (4) Montenegro's failure to disclose that he only married Avila to obtain legal resident status affected the essentials of the marriage.

8

The evidence supports the trial court's findings and conclusions that Montenegro committed fraud by inducing Avila into the marriage by making false representations about love and wanting children, the essentials of marriage and failing to disclose that he only married Avila to obtain resident status. Avila testified about Montenegro's aggressive courtship of Avila, his initial misrepresentations about his place of residence and career, his desire to be married in the United States, his knowledge about the immigration process, his lack of desire to be physically intimate with his spouse as a newlywed, and the vehicle and banking actions he took which excluded Avila. At trial, Montenegro did not refute Avila's testimony surrounding their courtship other than to explain that he told Avila he was a student, not an engineer, and that they had sexual intercourse one time prior to their marriage. Montenegro stated that Avila was not listed on his credit cards, vehicle registration, or life insurance policy because that he did not know how to properly fill out the applications.

Avila also testified about Montenegro's change in behavior once he received his permanent green card, and the timing and nature of his domestic violence allegations. Montenegro's conduct throughout the marriage established a preconceived plan to leave Avila once he received residence status. Montenegro purchased a life insurance policy without listing Avila as a beneficiary, he distanced himself from Avila once he received his green card, and he was heard to make comments about his arrangements and departure to his family in Columbia. He serviced his car, took out a significant loan without Avila's knowledge, and gave advance notice to his employer of his move to Katy, Texas.

As the trier of the fact is the sole judge of the credibility of witnesses, the trial court was permitted to believe Avila's testimony, and reject Montenegro's testimony. *See City of Keller*, 168 S.W.3d at 819. It was the trial court's duty to determine the weight of the evidence and

9

resolve any conflicts. *Sotelo*, 170 S.W.3d at 787. In the instant case, Montenegro's failure to disclose the motivating reason for wanting to marry Avila, which was to become a permanent legal resident in the United States, was evidenced by his conduct prior to and during his marriage to Avila. *See Leax v. Leax*, 305 S.W.3d 22 (Tex. App. – Houston [1st Dist.] 2009, pet. denied) (fact that wife failed to disclose her previous eight marriages to husband was sufficient to justify annulment based on fraud to induce him into the marriage); *See Villarreal v. Villarreal*, No. 09-09-00319-CV, 2010 WL 2854250 (Tex. App. – Beaumont July 22, 2010, no pet.) (annulment based on fraud upheld because content of wife's internet chats and dating profiles was sufficient evidence to establish she always intended to leave husband after acquiring his property and establishing her right to stay in the United States).

The trial court could have reasonably determined that Montenegro's conduct prior to and during the marriage constituted fraud to induce Avila to marry Montenegro and to stay in the marriage until he became a permanent legal resident and that Montenegro masked his true intent by making false promises about marriage and family. Avila relied on those false representations and as a result suffered injury. This is not a case of false representations of love made to induce one to marry another, rather here Montenegro engaged in fraud prior to and during the marriage until he received a green card. The trial court did not err in granting an annulment. Issue One is overruled.

**Voluntary Cohabitation**

In Issue Two, Montenegro contends that legally- and factually-insufficient evidence supported a finding that Avila did not cohabitate with him after learning of any fraud. Montenegro argues that legally- and factually-insufficient evidence supported an annulment based

10

on fraud because Avila voluntarily cohabitated with Montenegro after learning of his immigration status and after becoming dissatisfied with their intimacy and family planning.

It is undisputed that the couple lived together as husband and wife in the home of Avila's father until Montenegro left Avila on February 12, 2008. The trial court found that Avila immediately ceased living with Montenegro since realizing that "he never intended to have a meaningful relationship or kids with her, and that his sole intent in marrying her was to obtain an immigration benefit instead." The trial court found that it was not until February 12, 2008, that Avila realized Montenegro did not love her, never intended to have children with her, and only used her to obtain his legal resident status. Avila did not cohabitate with Montenegro since learning of the fraud.

The trial court, as fact finder, was the sole judge of the credibility of these two witnesses. *See City of Keller*, 168 S.W.3d at 819. In light of Avila's trial testimony, we conclude that there was legally-sufficient evidence to support the trial court's finding that Avila did not cohabitate with Avila after learning of Montenegro's fraud. *See id*. The trial court's findings are not so against the great weight and preponderance of the evidence as to be clearly wrong and are supported by factually-sufficient evidence. *See Sotelo*, 170 S.W.3d at 787. Because the evidence was both legally and factually sufficient to support the trial court's finding that Avila did not cohabitate with Montenegro after learning of any fraud, Issue Two is overruled.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

GUADALUPE RIVERA, Justice

April 11, 2012

Before McClure, C.J., Rivera, J., and Antcliff, J.

11