**Affirmed and Majority and Dissenting Opinions filed August 26, 2014.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00463-CV

---

### JAWED MANJLAI, Appellant

### V.

### NABILA HAMID MANJLAI, Appellee

---

**On Appeal from the 312th District Court
Harris County, Texas
Trial Court Cause No. 2011-44182**

---

# D I S S E N T I N G   O P I N I O N

Both an annulment and a divorce dissolve a marriage, but differences between the two procedures potentially impact the spouses' rights in significant and lasting ways. A divorce does not make the marriage void ab initio; an annulment might make the marriage so and arguably might affect the ability of one of the spouses to maintain status as a permanent resident of the United States of

America if that status was obtained based on the marriage that was later annulled. The Texas Legislature has provided for divorce under various scenarios arising after the parties' marriage and also for annulment under very narrow sets of circumstances arising before or at the time of the parties' marriage. The two legal remedies are not interchangeable. Using one in place of the other creates precedent contrary to the statute's unambiguous language. Because the trial evidence in today's case is legally insufficient to support the jury's findings in support of the annulment basis asserted, divorce, rather than annulment, is the proper outcome.

A wife who ceremonially married her husband in Texas filed suit seeking to annul their three-year marriage based on an allegation that the husband fraudulently induced her to marry him. As an alternative ground for dissolution of the marriage, the wife sought a divorce. The trial court granted an annulment based on jury findings. On appeal, the issue is whether the trial evidence is legally sufficient to support the jury's findings that the husband induced the wife to marry him by a materially false representation or promise and that the wife did not voluntarily cohabitate with the husband after realizing the alleged fraud. Because the evidence is legally insufficient to support the jury's findings, this court should reverse the trial court's judgment annulling the marriage and remand to the trial court for rendition of a divorce decree.

### *Appellate Issues*

Appellee/plaintiff Nabila Hamid Manjlai and her parents sued her husband appellant/defendant Jawed Manjlai, his parents, and his brother. Nabila sought an annulment of her marriage to Jawed under Texas Family Code section 6.107, on

2

the basis that Jawed fraudulently induced her to marry him, and in the alternative, she asked for a divorce. Nabila and her parents also sought money damages based upon claims for common-law fraud, conversion, and a claim under the Texas Theft Liability Act.

Following a jury trial, the trial court submitted jury questions dealing with Nabila's entitlement to an annulment. The jury answered the questions favorably to Nabila, and the trial court rendered judgment on the verdict annulling the marriage. Nabila's parents recovered money judgments against Jawed's father and brother and against Jawed.[1]

In the trial court Jawed filed a motion for judgment notwithstanding the verdict challenging the legal sufficiency of the evidence supporting the jury's answers to the two questions submitted. The trial court denied the motion. On appeal, Jawed asserts that the trial evidence is legally and factually insufficient to support the jury's answers to these questions and asks this court to reverse the trial court's annulment of the marriage.

### Standard of Review

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it.[2] We must credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury

---

[1] Jawed is the only party who has appealed. No party has challenged these money judgments. Thus, even if this court were to reverse the trial court's annulment of the marriage, these money judgments would be severed and affirmed.

[2] *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005).

could not.[3] We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue.[4] The jury is the only judge of witness credibility and the weightto give to testimony.[5]

### *The Potential Significance of the Distinction Between Annulment and Divorce*

The Texas Legislature has established three statutory means by which a marriage may be dissolved in Texas: (1) a suit for divorce, (2) a suit for annulment, and (3) a suit to declare a marriage void.[6] Under the Family Code, divorce is available under various circumstances arising after the parties' marriage.[7] By contrast, annulment is available only in limited circumstances arising before or at the time of the parties' marriage.[8]

Divorce dissolves the marriage but does not make it void ab initio—meaning void from its inception, as if it never happened.[9] Cases decided before the Legislature enacted the Family Code suggest that annulment makes the marriage void ab initio, at least as between the parties to the marriage.[10] The current version

---

[3]*See id.* at 827.

[4]*See id.*

[5]*See id.* at 819.

[6]*See* Tex. Family Code Ann. § 1.003 (West 2014).

[7]*See* Tex. Family Code Ann. § 6.001, *et seq*. (West 2014).

[8]*See* Tex. Family Code Ann. § 6.102, *et seq*. (West 2014). In addition, under the Family Code various types of marriages are void based upon the status of one or both of the parties to the purported marriage. *See* Tex. Family Code Ann. § 6.201, *et seq*. (West 2014).

[9]*See Garcia v. Garcia*, 232 S.W.2d 782, 783 (Tex. Civ. App.—San Antonio 1950, no writ).

[10]*See Home of Holy Infancy v. Kaska*, 397 S.W.2d 208, 212–13 (Tex. 1965) (stating that "[w]e generally think of an annulment as placing the parties in the same position as if they had never married" and that "[t]he annulment decree may relate back to the time of the marriage as between the parties to the former suit, but it will not be given that effect in determining the legitimacy of their child"); *Garcia*, 232 S.W.2d at 783 (stating that "[a] suit for annulment

4

of the Family Code does not state whether a marriage subject to annulment is voidable, void, or void ab initio.[11]  The parties have not cited and research has not revealed any case under the Family Code that contains an unequivocal holding as to whether an annulled marriage is void ab initio between the parties or as to third parties.[12]  The existence of a separate suit to declare a marriage void as well as several sections of the Family Code arguably might support the proposition that an annulled marriage is not void ab initio.[13]  On the other hand, various cases support the proposition that an annulled marriage is void ab initio between the parties or as to third parties.[14]

At trial, Nabila testified that she was told that if she is granted an annulment of the marriage, there is a possibility that Jawed might lose his "green card," that reflects his permanent-resident status and allows him to remain in this country. Nabila stated that she sought an annulment because she wants Jawed to lose his green card.  Nabila agreed that "the annulment is just window dressing maybe to get Jawed to lose his green card."

The issue of whether an annulled marriage is void ab initio between the parties or as to third parties is not before this court, nor is the issue of the effect, if any, of the trial court's 2013 annulment of the marriage on Jawed's immigration

---

presumes that there never was a valid marriage and that therefore it should be declared void").

[11]*See* Tex. Family Code Ann. § 1.001, *et seq*. (West 2014).

[12] Arguably, the court in *Fernandez v. Fernandez* may have held that the annulled marriage was void ab initio, but it did not expressly say so. *See* 717 S.W.2d 781, 782–83 (Tex. App.—El Paso 1986, writ dism'd).

[13]*See* Tex. Family Code Ann. §§ 1.003, 3.002, 7.002, 7.007 (West 2014).

[14]*See Home of Holy Infancy*, 397 S.W.2d at 212–13; *Fernandez,*717 S.W.2d at 782–83; *Bruni v. State*, 669 S.W.2d 829, 834–35 (Tex. App.—Austin 1984, no writ); *Garcia*, 232 S.W.2d at 783.

status. Nonetheless, whether the marriage is dissolved by annulment or divorce arguably might determine whether the marriage is void ab initio and whether Jawed may maintain his status as a permanent resident. Thus, it is important not to allow an annulment under circumstances in which a divorce is the proper remedy because doing so may wipe out valuable rights and create precedent that undercuts the statute's unambiguous language prescribing a narrow set of circumstances under which annulment is available.[15]

## *The Jury Findings*

Jawed asserts that the trial evidence is legally insufficient to support the jury's answer to the two questions submitted. In response to Question 1 the jury found that Jawed fraudulently induced Nabila into the marriage. The trial court instructed the jury that fraudulent inducement occurs when "a. a material false representation or promise has been made; and b. was known to be false when made; and c. was intended to be acted upon; and d. caused injury." Voluntary cohabitation after discovery of the fraud vitiates the grounds for an annulment under Texas Family Code section 6.107.[16] In response to Question 2 the jury found that Nabila did not voluntarily cohabitate with Jawed after realizing the fraud. These questions addressed Nabila's request that her marriage to Jawed be annulled under Texas Family Code section 6.107. At the charge conference, no party objected to the form of these two questions; therefore, this court measures the sufficiency of the evidence using the language of this question and the instructions

---

[15]*See* Tex. Family Code Ann. § 6.001, *et seq.*, § 6.102, *et seq.* (West 2014).

[16]*See* Tex. Family Code Ann. § 6.107 (West 2014) (stating that "[t]he court may grant an annulment of a marriage to a party to the marriage if: (1) the other party used fraud . . . to induce the petitioner to enter into the marriage; and (2) the petitioner has not voluntarily cohabited with the other party since learning of the fraud . . . .").

associated with it, even if they do not correctly state the law.[17]

Under the jury charge, fraudulent inducement in Question 1 had to be based either on a material, false promise that Jawed made to induce Nabila to marry him or on a material, false representation that Jawed made to induce Nabila to marry him. The evidence is insufficient to support either ground.

### *Insufficiency of Evidence to Support a Finding of a Material, False Promise made to Induce Marriage*

Nabila testified at trial as follows:

- Nabila married Jawed when she was twenty-one years old.

- It was an arranged marriage.

- She had not dated any others before she married Jawed.

- Nabila trusted her parents' judgment, but she was the one who ultimately decided to marry Jawed.

- Nabila understood before the marriage that Jawed did not have a green card.

- Nabila met Jawed in the middle of November 2007, and she thought that the marriage might work. Nabila's family and Jawed's family communicated throughout the following month.

- During the first week of January 2008, Nabila's family and Jawed's family agreed on the relationship, and Nabila and Jawed started planning their engagement. They had an engagement shower and an engagement party that month.

- There was a push from Jawed's family to get married in a civil ceremony so that Jawed could apply for a green card.

- Jawed and Nabila were civilly married on February 1, 2008, in a ceremony

---

[17]*See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding that appellate court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be charged using this standard).

conducted by a judge at a courthouse in Harris County, Texas (the "Civil Ceremony").

- Jawed and his parents wanted the civil ceremony to be first and then the religious ceremony to be six to nine months later so that the green-card process could move forward. Nabila and her parents did not agree to that because, in their culture, the married couple does not cohabitate until after the religious marriage ceremony. It was agreed that the religious marriage ceremony would be in March 2008.

- Jawed and Nabila were married in an Islamic wedding ceremony on March 19, 2008 (the "Religious Ceremony"). After that ceremony, Nabila moved into an apartment and lived with Jawed and his family.

Nabila testified that she believes the sole reason Jawed married her was to obtain a green card. But, even if the evidence is sufficient to support a finding that the sole reason Jawed married Nabila was to obtain a green card, this reason would not constitute either a material, false promise by Jawed or a material, false representation by Jawed. Nabila argues that Jawed made a materially false promise in his wedding vows because he intended to stay married to Nabila only until he obtained a permanent green card, at which time Jawed intended to divorce Nabila. Nabila testified regarding the vows made by Jawed at the Religious Ceremony. To the extent Nabila relies on these statements as being false promises by Jawed, as a matter of Texas law, these promises could not have induced Nabila to marry Jawed more than a month earlier in the Civil Ceremony. Similarly, to the extent Nabila relies upon the promises that Jawed made to Nabila's father in July 2011, and in the letter that Jawed signed that month, these promises were made more than three years after Jawed and Nabila were married in the Civil Ceremony. Thus, as a matter of law, these promises could not have induced Nabila to marry Jawed.

To the extent Nabila relies upon any statements Jawed made at the Civil

8

Ceremony as constituting false promises, there was no evidence at trial as to what Jawed or Nabila said or promised at that ceremony. Texas law does not require any particular form of marriage ceremony.[18] Thus, the fact that Jawed and Nabila had a valid ceremonial marriage under Texas law on February 1, 2008, by itself, is not evidence that Jawed promised to be Nabila's husband until one of them died, or beyond his receipt of a permanent green card.[19] There was no evidence at trial as to any promises Jawed made at the Civil Ceremony.

Even presuming that Jawed promised to be Nabila's husband and to take her as his wife, such action was required for Jawed to validly obtain his permanent green card. Under the applicable standard of review, the trial evidence is legally insufficient to support a finding that Jawed did not act as Nabila's husband and accept Nabila as his wife from February 1, 2008 through July 10, 2011. There was ample evidence at trial that Nabila was acting as Jawed's wife during this period. Though there was evidence of unseemly and abusive behavior by Jawed during the marriage, as well as significant friction between Nabila and Jawed's parents, such conduct is not inconsistent with Jawed acting as Nabila's husband. The evidence reflects that the couple lived together during most of this period, shared sexual relations, and held themselves out as husband and wife.

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting

---

[18]*See* Tex. Family Code Ann. § 2.203 (2014); *Coulter v. Melady*, 489 S.W.2d 156, 158 (Tex. Civ. App.—Texarkana 1972, writ ref'dn.r.e.) (stating that "The [Texas Family Code] prescribes no set form for a marriage ceremony or the procedure therein. The official conducting the ceremony is not required to elicit particular or specific information or answers from a party to the marriage, nor are participants required to speak or respond in a given way.").

[19]*See* Tex. Family Code Ann. § 2.203; *Coulter*, 489 S.W.2d at 158.

9

favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the trial evidence would not enable reasonable and fair-minded people to find that Jawed made a material, false promise to induce Nabila to marry him.[20]

### *Insufficiency of Evidence to Support a Finding of a Material, False Representation made to Induce Marriage*

Nabila testified at trial as follows:

- Between the Civil Ceremony and the Religious Ceremony, Jawed was picked up by immigration authorities.

- Nabila's father retained a law firm to assist Jawed in being released from custody. Jawed was released. Jawed promised to repay Nabila's father for the money expended in this regard but Jawed never did so.

- Nabila learned after the Civil Ceremony that Jawed was in the United States illegally when she met him in November 2007. At the time she met him she knew only that he did not have a green card. When he met Nabila, Jawed did not tell her that he was in the United States illegally.

- Jawed was a dentist in Pakistan and wanted to stay in the United States and build a career in dentistry. To do that, Nabila would have to help him, and she would have to sponsor him for a green card. This plan was discussed before the engagement and Nabila had no problem with it.

- When Nabila moved in with Jawed, she expected Jawed's family to go back to Pakistan, but they did not do so.

- Nabila lived with Jawed and his family for nine to ten months in a Pearland, Texas apartment. Nabila was not treated well. She was excluded from conversations that Jawed had with his family. Jawed hid things from Nabila and lied to her. Jawed took money from Nabila's bank account without her permission and without saying anything to her about it.

- Jawed never made any expression of love for Nabila throughout the entire relationship. When Nabila asked Jawed about it, he said, "I'm from Pakistan. I don't know about this stuff." To Nabila, it seemed like they

---

[20]*See City of Keller*,168 S.W.3d at 823, 827.

were two roommates living together.

- Towards the end of 2008, Nabila and Jawed moved from Houston, first briefly to Iowa and then to Boston for about eighteen months. During this period Nabila and Jawed were living together without Jawed's parents. Jawed's parents moved back in with the couple in August 2010, after Jawed lost his job. When Jawed's parents moved back in, Nabila again was mistreated.

- Four months later Jawed and his parents decided to move to Atlanta. Nabila did not want to move, but Jawed forced her to do so. After about two weeks in Atlanta, Nabila returned to Houston to live with her parents. Jawed and his parents continued living in Atlanta.

- Nabila told Jawed that he was welcome to come to Houston and live with Nabila at her parents' home. Jawed moved to Houston in February 2011, when his permanent green card arrived in the mail in Houston. Jawed lived with Nabila at her parents' home for about four months after receiving the permanent green card.

- Jawed's parents moved to Houston in June 2011.

- Nabila's parents had purchased $20,000 to $28,000 worth of gold jewelry over the years. Following Pakistani tradition, Nabila's parents gave her this jewelry to take to her new home after she married. Nabila gave the jewelry to Jawed's mother for safekeeping and Nabila did not see any of the jewelry again until June 2011, despite asking Jawed's mother several times to see the jewelry. In June 2011, Jawed's mother told Nabila that most of Nabila's jewelry had been stolen in 2009. Approximately $8,000 in gold jewelry eventually was returned to Nabila.

- At the end of June 2011, Nabila's father talked to Jawed and told Jawed that he should replace Nabila's jewelry, stop lying, be a better person, that the money Jawed's parents owed to Nabila's father should be repaid, and that Jawed's parents should move back to Pakistan. Jawed said that he would do these things. He was supposed to accomplish them by July 10, 2011. Jawed also signed a letter that Nabila wrote in which he promised to change his behavior. Jawed did not fulfill his promises to Nabila's father.

- On July 10, 2011, Jawed texted Nabila that "it's all over." At trial, Nabila had not heard from Jawed since. Two or three days after receiving the text message, Nabila found out from a member of the community that Jawed had divorced Nabila pursuant to Islamic law shortly after sending that text. In

11

Nabila's culture, once a man divorces a woman under Islamic law, she can never return to him. It was then that Nabila realized that Jawed married her only for the green card.

- After they were married, Jawed suggested that Nabila apply for a student loan. After she applied, Jawed told her that she had been turned down. Nabila later learned that the loan had been approved, and that Jawed obtained the $2,500 loan proceeds without telling her and used the money for his own purposes. The bank then pursued Nabila for payment of this debt.

- Nabila is seeking an annulment of the marriage because it is a fraud. Nabila stated that the marriage is a fraud because, though it was legal, "everything that happened in the marriage was not correct."

Nabila cited a litany of conduct that she contended constituted fraud that would support her request for annulment. Nabila asserted that Jawed committed fraud by (1) taking money from her bank account after the Civil Ceremony, (2) hiding various matters from Nabila after the Civil Ceremony, such as Jawed's receipt of $33,500 from an unknown source, (3) sending money to Jawed's parents even though he had not paid the debt to Nabila's father, (4) lying to her after the Civil Ceremony, (5) texting her on July 10, 2011, that the relationship was over five days after signing a letter promising to change his ways, and (6) borrowing money and not repaying it. Significantly, all of this conduct occurred after Jawed and Nabila were married in the Civil Ceremony. Thus, as a matter of law, this post-marriage conduct could not have induced Nabila to marry Jawed.[21]

Nabila asserted that Jawed committed fraud by failing to disclose before the Civil Ceremony his prior relationship with another woman, Anna Saed, and that he

---

[21]Nabila also testified that she discovered Jawed's alleged fraud in lying to her and concealing matters from her but that she continued to live with Jawed as his wife and have sexual relations with him because she was a good wife and she wanted him to change.

was in the United States illegally. But, the jury was not charged on fraudulent nondisclosure and these alleged nondisclosures are not misrepresentations.[22] Nabila alleges that Jawed committed fraud because he allegedly married her to obtain a green card. But, even if he married Nabila with this motivation, this conduct was not a misrepresentation which induced Nabila to marry Jawed.[23]

Nabila testified several times that Jawed did not make any representations to her before marriage and that he did not promise that his parents would move back to Pakistan. Nonetheless, at one point during her trial testimony Nabila stated that Jawed told her that his parents would move back to Pakistan. Presuming for the sake of argument that this statement was made before the Civil Ceremony, under the applicable standard of review, the evidence is legally insufficient to support a finding that Nabila did not cohabitate with Jawed after realizing that Jawed's parents were not moving back to Pakistan.[24] The subsequent cohabitation vitiates any such fraud.

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the trial evidence would not enable reasonable and fair-minded people to find that Jawed made a material, false representation to induce Nabila to marry him.[25]

---

[22]*See Osterberg*, 12 S.W.3d at 55; *Flo Trend Sys., Inc. v. Allwaste, Inc.*, 948 S.W.2d 4, 10 (Tex. App.—Houston [14th Dist.] 1997, no writ).

[23]*See Osterberg*, 12 S.W.3d at 55; *Flo Trend Sys., Inc.*, 948 S.W.2d at 10.

[24]*See City of Keller*, 168 S.W.3d at 823, 827. The result would be the same whether this statement is considered to be an alleged promise or an alleged misrepresentation.

[25]*See City of Keller*, 168 S.W.3d at 823, 827. There are several court of appeals cases in which

## *Conclusion*

Under Texas law, there are a wide range of circumstances under which a divorce is available, but the circumstances under which a marriage may be annulled are far more limited. In this case, the evidence is legally insufficient to support the jury's findings regarding the annulment ground based on fraudulent inducement.[26] Though the record contains evidence that Jawed engaged in deceptive conduct after the parties were married, this post-marriage conduct does not entitle Nabila to an annulment of the marriage. This court should sustain Jawed's appellate issue as to his legal-insufficiency argument, sever and affirm the trial court's judgment as to the defendants other than Jawed, reverse the trial court's judgment as to Jawed, and remand with instructions to the trial court to render a divorce decree. Because the court does not do so, I respectfully dissent.

/s/     Kem Thompson Frost
        Chief Justice

Panel consists of Chief Justice Frost and Justices Jamison and Wise (Wise, J., majority).

---

sister courts have held that the evidence is legally sufficient to support fact findings in support of annulment under Texas Family Code section 6.107, but the evidence in these cases was materially different from the evidence in the case under review. *See Desta v. Anyaoha*, 371 S.W.3d 596, 598–600 (Tex. App.—Dallas 2012, no pet.); *Montenegro v. Avila*, 365 S.W.3d 822, 823–28 (Tex. App.—El Paso 2012, no pet.); *Villareal v. Villareal*, No. 09-09-00319-CV, 2010 WL 2854250, at *4–5 (Tex. App.—Beaumont July 22, 2010, no pet.) (mem. op.); *Leax v. Leax*, 305 S.W.3d 22, 28–31 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

[26] Because the evidence is legally insufficient, there is no need to address Jawed's assertion that the evidence is factually insufficient.